1   **WO**

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                      **FOR THE DISTRICT OF ARIZONA**

8

9   Michael Apelt,                          )   No. CV-98-882-PHX-ROS
                                            )
10              Petitioner,                  )   <u>DEATH PENALTY CASE</u>
                                            )
11  vs.                                      )   **MEMORANDUM OF DECISION**
                                            )   **AND ORDER REGARDING**
12                                           )   **CONVICTION-RELATED CLAIMS**
    Dora Schriro, et al.,                    )
13                                           )
                Respondents.                )
14  _____ )

15

16          Michael Apelt ("Petitioner") filed a Second Amended Petition for Writ of Habeas

17  Corpus alleging he is imprisoned and sentenced to death in violation of the United States

18  Constitution.  (Dkt. 63.)[1]  In previous orders, the Court found that Claims 1-A, 1-B, 2, 3 (in

19  part), 4, 5, 6, 7, 9, 10, and 13 were procedurally barred and that Claim 20 was not cognizable

20  on federal habeas review.  (Dkts. 132, 180.)  The Court also stayed Petitioner's sentencing-

21  related claims pending resolution of a new claim in state court based on *Atkins v. Virginia*,

22  536 U.S. 304 (2002).[2]  (Dkt. 117.)  The parties have completed briefing on the merits of the

23  remaining conviction-related claims, Claims 3 (in part) and 8.  (Dkts. 154, 169, 176.)  This

24  Order addresses those claims and concludes that they do not entitle Petitioner to habeas

25  relief.

26  _____

27      [1]      "Dkt." refers to the documents in this Court's file, "ROA" to the state court
    record on appeal (CR-90-0246-AP), and "RT" to the reporter's transcripts.

28      [2]      In *Atkins*, the United States Supreme Court held that the Eighth Amendment
    prohibits a state from sentencing to death or executing a mentally retarded person.

**BACKGROUND**

In August 1988, Petitioner and his brother Rudi, the Apelts, accompanied by Rudi's wife, Susanne, and Petitioner's girlfriend, Anke Dorn, traveled from their native Germany to America.[3]  In California and then in Arizona the Apelts and Dorn embarked on a series of romantic and financial cons that culminated in Petitioner's marriage to, and the subsequent murder of, Cindy Monkman.

In San Diego, California, the Apelts rented an apartment, and indicated they owned an insurance company.  (RT 5/9/90 at 37.)  One night they met two women in a nightclub, Cheryl Rubenstein and Trudy Waters, who lived in Phoenix and were visiting San Diego over the weekend.  They spent the evening talking with the Apelts, who first claimed to be wind surfing board manufacturers, then Mercedes importers.   The women gave the Apelts their addresses and phone numbers.

Approximately two weeks later the Apelts flew to Phoenix.  Ms. Rubenstein picked them up at the airport and took them to a hotel in Mesa.  They then moved to a Motel 6, but told Rubenstein they were staying at the more expensive Holiday Inn.  After a few weeks, they flew back to San Diego, picked up Anke Dorn, and returned to Phoenix and Rudi's wife returned to Germany.

On September 16, 1988, Petitioner met Kealinda Amara at Bobby McGee's, a restaurant-lounge in Mesa, Arizona.  (RT 4/24/90 at 42.)  Petitioner told Ms. Amara that he and his brother owned a corporation, which Rudi ran, and she was also told their father owned the BMW company.  (*Id.* at 47-48.)  Three days later, Petitioner asked Ms. Amara to marry him.  (*Id.* at 49, 51.)  Petitioner showed Ms. Amara a contract for a $425,000 house in Ahwatukee that he proposed they would live in when married.[4]  (*Id.* at 54.)

---

[3]     Except where otherwise indicated, the factual summary is adapted from the decision of the Arizona Supreme Court in *Apelt*, 176 Ariz. 349, 353-57, 861 P.2d 634, 638-42 (1993).

[4]     The Apelts also showed the paperwork for the Ahwatukee house to Ms. Rubenstein, telling her they were going to give it to her and her family.  (RT 4/19/90 at 38.)

1    Petitioner also told Ms. Amara he owned a million-dollar mansion in San Diego, that

2    Anke Dorn was his maid, and that he paid his maids $5,000 a month. (*Id.* at 58-59.) At some

3    point he told Amara that Dorn had burned his mansion and that he had to return to San Diego

4    to resolve this issue. (*Id.* at 60.)  He appeared visibly distressed when recounting this

5    problem. (*Id.*)  Ms. Amara took Petitioner to the airport and bought airline tickets for him

6    and Rudi. (*Id.* at 63.)

7    On October 2, 1988, Ms. Amara informed Petitioner she would not marry him;

8    Petitioner responded that he would return to Germany. (*Id.* at 71.)  The next day, Ms. Amara

9    received a telegram stating that Rudi had been killed in an auto accident and it was up to

10   Petitioner to take over the Apelts' business empire.[5] (*Id.* at 73, 83.)  Petitioner and Rudi later

11   indicated to Ms. Amara they were waiting for $450,000 to be wired from Europe. (*Id.* at 78-

12   79.)

13   The next focus of Petitioner's attention was Charlene Clark.  Petitioner met her at

14   Bobby McGee's on October 1, 1988 (RT 4/20/90 at 182-83), and the next day he told her he

15   loved her and would be the father of her boy (*id.* at 187-90).  Ms. Clark, who was not

16   convinced of Petitioner's sincerity, turned off her phone's ringer; she did not see Petitioner

17   again until six weeks later when he introduced her to his new wife, Cindy. (*Id.* at 191.)

18   On October 6, 1988, the Apelts met Annette Clay at Bobby McGee's.  Rudi claimed

19   to be an international banker.  Annette gave him her phone number, and Rudi called her the

20   following Saturday.  She met the Apelts at Bobby McGee's that evening, and introduced

21   them to her friends, Cindy and Kathy Monkman.  Petitioner focused on Cindy and spent the

22

---

23   This occurred after the brothers took Ms. Rubenstein to an apartment building supposedly
     in order to fire their interpreter. They also took her to the building that housed what they
24   purported to be their business, the Tanner Corporation. Petitioner entered the building and
     then exited with a set of keys to his alleged secretary's car. (*Id.* at 37.)  In fact, the car
25   belonged to Ms. Amara, who worked at Tanner.

26
27   [5]     During the same time period, the Apelts used an alternate version of the ruse,
     with Petitioner as the deceased, Dorn in the role of Rudi's secretary, and the telegram sent
28   to Ms. Rubenstein.  (RT 5/2/90 at 29.)

evening dancing and talking with her.  He told her repeatedly that he wanted to marry her.
The Apelts claimed to be computer and banking experts.  Petitioner told them he worked for
IBM, servicing their computers for a number of banks.  (RT 4/18/90 at 105.)  While courting
Cindy, Petitioner initially drove Ms. Amara's Chevy Nova, which he claimed was a company
car.  (*Id.* at 110.)

   During the next week Annette and Cindy saw the Apelts several times.  When Cindy
noticed after the Apelts left her apartment she was missing over $100 in cash, she and
Annette became suspicious.  They questioned whether the Apelts were actually staying at the
Holiday Inn and, by calling several hotels in the area, discovered that they were registered
at a Motel 6.

   When confronted with this information, the Apelts insisted there was a mistake.  That
evening, after dropping the Apelts at the Holiday Inn, the women located their room at the
Motel 6 and discovered Anke Dorn.

   The next day, the Apelts were seemingly furious and claimed the women's snooping
destroyed their "high security clearance" and cost them their jobs and their work visas.  They
explained that Dorn was a family friend whose husband was in the hospital.   The women
were apologetic and suggested various ways they could help the brothers get their jobs back
or find new jobs for them, but the Apelts refused this offer.  Finally, in frustration, Annette
exclaimed "what do you want us to do, marry you?"  The Apelts replied, "yes."

   Thereafter, the Apelts moved, Rudi into Annette's apartment and Petitioner into
Cindy's.  Annette discussed with Rudi the possibility of a sham marriage so he could work
in the United States, but Rudi insisted he loved her and if they married it would be
permanent.  He also insisted they keep the marriage secret.  Rudi had been staying with
Annette less than a week when Annette discovered that what she was told regarding Dorn
was a lie.  Annette told Rudi to leave and did not see him again.  Rudi and Dorn then moved
into a motel.  Thereafter, Petitioner told Annette several times that Rudi had returned to
Germany, and Cindy believed that Rudi and Dorn had left the country.

   On October 28, 1988, Cindy and Petitioner were secretly married in Las Vegas.  On

November 7, at Petitioner's suggestion, they consulted an insurance agent named Doug Ramsey about a million dollar life insurance policy. Cindy believed Petitioner was wealthy and that purchasing large insurance policies was a customary investment practice for couples in Germany. Ramsey informed them they did not qualify for such a large policy but they might qualify for a $400,000 policy. They filled out an application and Cindy wrote a check for the first month's premium.

Around this time, and continuing up to the time of the murder, the Apelts and Dorn went on a series of shopping trips while driving Cindy's Volkswagen. They looked at expensive Piaget and Rolex watches, about which they seemed to the sales persons to be very knowledgeable. (RT 4/24/90 at 186.) At one time they negotiated to buy three watches for a total price of approximately $130,000. The Apelts looked at expensive boats and cars. They test drove and arranged to buy two Jaguars for $144,000. They also made arrangements to purchase two Toyota Supras for about $66,000, and looked at two matching $100,000 Porsches. According to the Jaguar salesman, they were "very well-educated" about these vehicles; "[t]hey knew what they were talking about, and they seemed to know what they wanted in a car," which, with respect to the Jaguars, was "an XJS with a special TWR" racing package. (RT 4/24/90 at 173.) While shopping, the Apelts' pattern was to pose as international businessmen (RT 4/20/90 at 74), the sons of an ambassador in Washington, D.C., (RT 4/24/90 at 176), or professional athletes.[6] (*See* RT 4/24/90 at 187.) They would then execute a purchase contract, make a nominal down-payment with assurances that they would pay cash upon receiving money from sources in Germany, and never return. During one of the shopping trips, Petitioner told Dorn that if Cindy died an unnatural death, he would be rich.

By now the Apelts had run out of money. Petitioner paid most of Rudi's and Dorn's expenses with Cindy's money, even though Cindy's income from her two part-time jobs was

---

[6]    At various times, the Apelts convincingly passed themselves off as a kicker trying out for the Washington Redskins, a European basketball player, and professional tennis players. (*See, e.g.*, RT 4/19/90 at 150.)

modest.

On November 25, Ramsey the insurance agent informed Petitioner and Cindy they qualified only for a $100,000 life insurance policy. On November 30, they executed a change form and applied for a $300,000 policy from another company.

In the days before Cindy was murdered the Apelts purchased a $200 cross bow, which they used for target practice in the desert near Apache Junction. (RT 5/9/90 at 85-87.) When they found they were unsuccessful shooting the weapon, they purchased razor tips and a scope. (*Id.*)

Early in December, Rudi and Dorn reserved a rental car for December 9. They specifically requested a vehicle with a large trunk. Around this time, Ramsey informed Cindy that the second insurance company would not approve the application for a $300,000 policy until it had more background and financial information. Cindy provided the information, and Ramsey resubmitted the application. In the interim, Rudi cancelled the car reservation.

On December 22, 1988, Ramsey informed Cindy and Petitioner that the $300,000 policy was approved and would be effective after Cindy paid the first premium. It was issued based on background information from Petitioner indicating that he had a $540,000 estate in Germany, that he had formerly been employed as a computer expert working for IBM, and that he was in the United States studying so that he could again be similarly employed. (RT 4/27/90 at 122.)

On the morning of December 23, Cindy and Petitioner took the Volkswagen in for repairs and rented a Subaru. Cindy was preparing to leave the next day for Illinois with her sister Kathy. She made plans to meet Annette for dinner at 8:00 p.m. to exchange gifts. She also planned to have dinner with Maria, a woman she had been counseling.

That same day Rudi rented a car with the large trunk like the one they had originally reserved for December 9, and Petitioner returned to Rudi's and Dorn's motel room. Petitioner told them they would have a "lot of money" if he killed Cindy and they agreed to kill her that evening. They made plans to meet in front of a German restaurant and then go

to the desert, where Cindy would be killed.  Petitioner said that he would bring Cindy and would make sure she could not see where they were going.

Cindy spoke with her father by phone followed by a telephone conversation she had with Maria from 6:50 p.m. to 7:00 p.m. in which she confirmed that she and Petitioner would pick Maria up at 7:45 p.m. for dinner.  During the conversation, Maria heard Petitioner in the background.

Rudi and Dorn drove the rental car to the German restaurant at about 7:00 p.m. and waited for Petitioner.  Petitioner drove by in the Subaru approximately fifteen minutes later and Dorn did not see Cindy in the car.  Rudi, driving his rental car accompanied by Dorn, followed Petitioner toward a desert area where they had earlier practiced shooting the crossbow.  Rudi turned off the road when he reached the location, but Petitioner continued on.  Rudi drove around the desert for some time before spotting Petitioner's car.  He drove toward it, stopped some distance away, and got out of the car, ordering Dorn to remain in the vehicle and lie down.  He returned after about five minutes and both he and Petitioner drove to the motel where Rudi and Dorn were staying.  The Apelts showered and changed clothes.

Then the Apelts and Dorn met at Bobby McGee's at 10:30 p.m. and asked for a table for four.  After waiting, ostensibly for Petitioner's wife, they ordered dinner.  (RT 5/3/90 at 109.)  The Apelts discussed their alibi.  They had several drinks and went to another nightclub.  Petitioner arrived home at around 2:00 a.m. on December 24 after dropping off Rudi and Dorn at their motel.  The next day, Rudi returned the rental car.

There were many calls on Cindy's answering machine from Annette and Kathy because they were worried that Cindy failed to show up for dinner or call Kathy as planned.  Annette called and spoke with Petitioner, who told her that Cindy had left the house at around 7:00 p.m. after receiving a phone call from an angry man.  Petitioner claimed that Cindy said she had to meet someone and would meet him at Bobby McGee's at 10:00 p.m.  Annette came over to Petitioner's apartment and called the police.  She noticed that Cindy's purse was still in the apartment.  An officer came and spoke with Petitioner and Annette.

1    Petitioner repeated his story to the officer, with Annette acting as a translator.[7]  The next day
2    when Petitioner went out for lunch, he had Dorn leave a note for Cindy on their door
3    purportedly in case Cindy arrived while they were out.  (RT 5/8/90 at 171.)

4        Cindy's body was found in the early afternoon of December 24.  She had been stabbed
5    once in the lower chest and four times in the back.  Her throat had been slashed so deeply
6    that her head was nearly severed from her body.  There were numerous bruises on her face
7    and body.  Police found a nylon cord and a blood-soaked beach towel near her.

8        There were many tire tracks in the area, although only two were clear enough to
9    analyze.  They were consistent with the car tires of the car driven by Rudi.  There was a
10   fairly good shoe impression near the body and a partial shoe print on the victim's face as
11   though the murderer had kicked or stepped on her head.  These showed tread marks that were
12   later found to be consistent with a particular style of Reebok tennis shoes.

13       Later that day officers interviewed Rudi and Dorn.  They repeated the previously
14   agreed-upon story, claiming they had seen Cindy leaving the apartment at 7:00 p.m. and that
15   she promised to meet them at Bobby McGee's.  When Cindy's body was located, officers
16   called the Apelts and asked them to come to the station, which they did.  When informed that
17   his wife's body had been found, Petitioner screamed, slammed his fist onto a table, and
18   began sobbing.  (RT 4/26/90 at 103.)

19       On the night of December 25, Rudi and Dorn accompanied Petitioner as he drove the
20   rented Subaru around the Salt River bottom.   He drove erratically, making hard turns and
21   slamming on the brakes in an apparent effort to change the tread of the tires so they could not
22   be linked to the murder scene.  When confronted by a police officer who was patrolling the
23   area, Petitioner explained they were looking for his missing wife.  (RT 4/27/90 at 192.)  Two
24   of the tires had to be replaced after the car was returned to the rental agency because they had

25   _____

26       [7]    Annette testified that Petitioner could understand the conversation, even though
     German is his native language.  (RT 4/18/90 at 183.)  She recounted a previous conversation
27   with Petitioner about his English-language abilities, in which he indicated that he and his
     brother would fake a language barrier to "pull the wool over people's eyes."  (*Id.* at 185.)
28

flat spots caused by Petitioner's driving.

Using the insurance policy as collateral, Petitioner borrowed some money and flew to Illinois with Rudi and Dorn to attend Cindy's funeral on December 31. Petitioner cried at the funeral, and was unable to finish his eulogy, so Rudi stepped in and completed it. (RT 4/18/90 at 68-69.) Later, Kathy saw Petitioner and Rudi grinning and appearing jovial as they drove away after the service. That evening, while the Apelts and Dorn were at a disco, Petitioner told Dorn that Cindy had signed her own death warrant when she signed the insurance papers, but that he regretted killing her. The Apelts and Dorn returned to Phoenix on January 2.

The next morning, the Apelts and Dorn flew to Los Angeles using assumed names. Outside a restaurant, they approached a homeless black man and paid him $20 to read the following message over the phone onto Cindy's answering machine:

> Hear what I have to talk. I have cut through the throat of your wife and I stabbed and more frequently in the stomach in the back with a knife. If I don't get my stuff, your girlfriend is next and then your brother and last it is you. Do it now, if not, you see what happens. My eyes are everywhere.

They then returned to Phoenix that afternoon and Petitioner contacted Detective Ron Davis, a police officer who spoke fluent German, and asked him to translate the message. Detective Davis listened to the message and instructed the Apelts to bring the tape to the police station the next day.

Meanwhile, the police had discovered the insurance policy and identified Petitioner as a possible suspect. The taped threat, which Detective Davis determined was a clumsy English translation of a text originally composed in German, confirmed their suspicions and, fearing that the Apelts and Dorn might leave the country, the police arranged to have a surveillance team watch them on the night of January 5. Officers were deployed around the apartment complex at 5:30 p.m. Shortly after 8:30 p.m. one of the officers knocked on the Apelts' door to insure they were home. When Petitioner answered the door, the officer asked for a fictitious person and was told he had the wrong apartment. Immediately after this, the Apelts called the police and reported that three tall, armed black men had appeared at their

door, threatening them and telling them to come to Los Angeles to straighten out a problem involving drugs.  (RT 4/26/90 at 124.)  The surveillance team was contacted and confirmed this had not occurred.  Detective Davis told the Apelts and Dorn to come to the police station the next day to make composite sketches of the assailants.

Accordingly, on January 6, the Apelts and Dorn went to the police station.  The police spoke with the brothers separately and prepared artist's sketches based on their descriptions. Petitioner indicated that the black men were tall, six feet five inches and six feet six inches, they wore expensive suits and sunglasses, and one of them resembled the black guy on Miami Vice.  He added, they spoke slowly, as if aware Petitioner did not speak English.  (RT 4/27/90 at 23-24.)  Petitioner suggested there must be a leak within the police department, otherwise the black men would not have known the Apelts were at home.  (*Id.* at 25.)

During the interview, Petitioner denied ever having been to the Apache Junction area. (RT 4/27/90 at 28.)  He also denied owning tennis shoes, explaining they made his feet stink. (*Id.* at 29.)

The police waited a couple of hours and then began interrogating Dorn.  They urged her to tell the truth, told her she would be prosecuted, promised her immunity in exchange for her confession, and showed her photographs of Cindy's body.  Dorn confessed and the Apelts were arrested.  They were questioned again, and invoked their right to remain silent. (*See* RT 1/12/90 at 85, 159, 161.)

On January 9, the police searched Cindy's apartment and seized a number of items, including the Apelts' shoes, the crossbow, and business cards in connection with the jewelry stores and car dealerships that the Apelts had visited.  They also seized two rolls of film containing photos of Petitioner wearing tennis shoes with tread matching the footprint and impression left at the murder scene.

While the brothers were in jail, Petitioner sent Rudi a note in German discussing possible alibis, including the possible commission of a copy-cat killing to take place while the Apelts were incarcerated.  The note, as translated, read:

> I have a guy who will play the game once again.  Don't do anything yet,

okay!  I was taken out of the tank because the County Attorney said I had AIDS.  I'll be back in the tank for fourteen days, so I'll talk and then I'll be back.  The attorney told me I had an alibi for Friday, 12/24/88 at 7:30–7:40 and you have it starting at 2200 on Friday.  I said that I saw you at the table, then you went walking around and then you were standing on the dance floor. Otherwise everything is okay.  Write me about the plan you talked about or what you have planned, okay!  Because I have a guy who will do it for five thousand dollars U.S., one thousand percent for sure.  But if you have a better idea, let me know.  Only write, you well know, there are police in here, okay. Don't say too much.  Till soon.

P.S.  You will see me soon again when I walk past your tank.  I believe, on the 14th or 17th of this month.  Oh, yes, what I wanted to tell you, it will happen next week, just so you'll know.  Play dumb.  I will, too.

When the police tell you the tires of the car and the tracks are the same, tell them you were out there with Anke on Friday afternoon to shoot the crossbow, they won't be able to do anything then.  Only if the police say anything, tell them Friday afternoon.  Don't break out, okay.  Because I have a guy who is getting out in two-four days and then we'll be free in one to two weeks.  It won't matter if the police have anything or not.  We're in jail and won't be able to have done that, so don't do anything, okay!  Because when a woman is dead, the same thing will have happened, we'll be free and I'll have the money because the police won't be able to do anything.

(RT 5/8/90 at 61-62.)  Another note from Petitioner continued the discussion of alibis and defense strategies:

My attorney was here and said the alibi with the travel agency is not good anymore because Anke is saying 1/3/89 and not 1/5/89.  The travel agency will give an alibi as of 1/5/89, not 1/3/89.  The police found a taxi driver who says he picked us up at 601 South Alma School and drove us to the airport on 1/3/89 at 8:40 and the police have the names . . . on the flight from Phoenix to L.A.  This corresponds with what Anke is testifying.  Other than that, the police have nothing. . . . We can still say we went to the airport to complain because the flight took eighteen hours.    Anke is here, she has to testify at the big trial again.  The police cannot say anything about the car tires or the footprint yet.  We have to prove Anke is lying.  You think of something, too.

(*Id.* at 62-63.)

In his trial testimony, Petitioner offered a variety of explanations for the inculpatory information contained in his jail notes.  He contended that the reference to a copy-cat killing was simply the report of a dream he had that the real killer would strike again and that he and his brother would be set free.  (RT 5/9/90 at *Id.* at 26.)  He also testified that any plans for escape were made with the goal of contacting the FBI so agents could pursue the case more objectively than the state authorities.  (*Id.* at 15.)  Additionally, Petitioner indicated that the

1   letters were an intended ruse to prevent his brother from attempting to escape.  (*Id.* at 18.)

2   According to Petitioner, all of the notes were written under the stress of being wrongly

3   arrested and incarcerated.  (*Id.* at 15-16.)

4       Petitioner and Rudi were tried separately, with Petitioner's occurring first.  Dorn was

5   granted immunity and testified at both trials.  A jury found Petitioner guilty of conspiracy to

6   commit first-degree murder and first-degree murder.  (ROA 285, 286.)  The court sentenced

7   Petitioner to death on the murder conviction.  (ROA 321, 322.)

8       While his direct appeal was pending, Petitioner filed a First Petition for Post-

9   Conviction Relief ("PCR") pursuant to Rule 32 of the Arizona Rules of Criminal Procedure.

10  The Arizona Supreme Court re-vested jurisdiction in the trial court to resolve the merits of

11  the petition.  The trial court summarily dismissed the petition, and Petitioner filed a Petition

12  for Review in the Arizona Supreme Court.  The Arizona Supreme Court consolidated the

13  petition and direct appeal, denied post-conviction relief, affirmed the convictions and

14  sentence, *Apelt*, 176 Ariz. at 353, 861 P.2d at 638, and denied Petitioner's motion to

15  reconsider.

16      Petitioner filed a second PCR petition and amended it to include additional claims.

17  The trial court denied relief.  After a change of counsel, Petitioner sought discretionary

18  review by the Arizona Supreme Court, which was denied.  On May 14, 1998, Petitioner

19  initiated the proceedings before this Court by filing a Petition for Writ of Habeas Corpus.

20  (Dkt. 1.)

21              **AEDPA STANDARD FOR RELIEF**

22      Petitioner's habeas claims are governed by the applicable provisions of the

23  Antiterrorism and Effective Death Penalty Act (AEDPA).  *See Lindh v. Murphy*, 521 U.S.

24  320, 336 (1997).  The AEDPA established a "substantially higher threshold for habeas relief"

25  with the "acknowledged purpose of 'reducing delays in the execution of state and federal

26  criminal sentences.'"  *Schriro v. Landrigan*, 127 S. Ct. 1933, 1939-40 (2007) (quoting

27  *Woodford v. Garceau*, 538 U.S. 202, 206 (2003)).  The AEDPA's "'highly deferential

28  standard for evaluating state-court rulings' . . . demands that state-court decisions be given

the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam) (quoting *Lindh,* 521 U.S. at 333 n.7).

Under the AEDPA, a petitioner is not entitled to habeas relief on any claim "adjudicated on the merits" by the state court unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The phrase "adjudicated on the merits" refers to a decision resolving a party's claim which is based on the substance of the claim rather than on a procedural or other non-substantive ground. *Lambert v. Blodgett*, 393 F.3d 943, 969 (9th Cir. 2004). The relevant state court decision is the last reasoned state decision regarding a claim. *Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)); *Insyxiengmay v. Morgan*, 403 F.3d 657, 664 (9th Cir. 2005).

"The threshold question under AEDPA is whether [the petitioner] seeks to apply a rule of law that was clearly established at the time his state-court conviction became final." *Williams v. Taylor*, 529 U.S. 362, 390 (2000). Therefore, to assess a claim under subsection (d)(1), the Court must first identify the "clearly established Federal law," if any, that governs the sufficiency of the claims on habeas review. "Clearly established" federal law consists of the holdings of the Supreme Court at the time the petitioner's state court conviction became final. *Williams*, 529 U.S. at 365; *see Carey v. Musladin*, 549 U.S. 70, 127 S. Ct. 649, 653 (2006); *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003). Habeas relief cannot be granted if the Supreme Court has not "broken sufficient legal ground" on a constitutional principle advanced by a petitioner, even if lower federal courts have decided the issue. *Williams*, 529 U.S. at 381; *see Musladin*, 127 S. Ct. at 654; *Casey v. Moore*, 386 F.3d 896, 907 (9th Cir. 2004). Nevertheless, while only Supreme Court authority is binding, circuit court precedent may be "persuasive" in determining what law is clearly established and

1    whether a state court applied that law unreasonably.  *Clark*, 331 F.3d at 1069.

2         The Supreme Court has provided guidance in applying each prong of § 2254(d)(1).

3    The Court has explained that a state court decision is "contrary to" the Supreme Court's

4    clearly established precedents if the decision applies a rule that contradicts the governing law

5    set forth in those precedents, thereby reaching a conclusion opposite to that reached by the

6    Supreme Court on a matter of law, or if it confronts a set of facts that is materially

7    indistinguishable from a decision of the Supreme Court but reaches a different result.

8    *Williams*, 529 U.S. at 405-06; *see Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam).  In

9    characterizing the claims subject to analysis under the "contrary to" prong, the Court has

10   observed that "a run-of-the-mill state-court decision applying the correct legal rule to the

11   facts of the prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to'

12   clause."  *Williams*, 529 U.S. at 406; *see Lambert*, 393 F.3d at 974.

13        Under the "unreasonable application" prong of § 2254(d)(1), a federal habeas court

14   may grant relief where a state court "identifies the correct governing legal rule from [the

15   Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case" or

16   "unreasonably extends a legal principle from [Supreme Court] precedent to a new context

17   where it should not apply or unreasonably refuses to extend that principle to a new context

18   where it should apply."  *Williams*, 529 U.S. at 407.  For a federal court to find a state court's

19   application of Supreme Court precedent "unreasonable" under § 2254(d)(1), the petitioner

20   must show that the state court's decision was not merely incorrect or erroneous, but

21   "objectively unreasonable."  *Id.* at 409; *Landrigan*, 127 S. Ct. at 1940; *Visciotti*, 537 U.S. at

22   25.

23        Under the standard set forth in § 2254(d)(2), habeas relief is available only if the state

24   court decision was based upon an unreasonable determination of the facts.  *Miller-El v.*

25   *Dretke*, 545 U.S. 231, 240 (2005) (*Miller-El II*).  A state court decision "based on a factual

26   determination will not be overturned on factual grounds unless objectively unreasonable in

27   light of the evidence presented in the state-court proceeding."  *Miller-El*, 537 U.S. 322, 340

28   (2003) (*Miller-El I*); *see Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004).  In

considering a challenge under § 2254(d)(2), state court factual determinations are presumed to be correct, and a petitioner bears the "burden of rebutting this presumption by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *Miller-El II*, 545 U.S. at 240.

### DISCUSSION

The standards in the AEDPA will be applied to Petitioner's remaining properly-exhausted conviction-related claims.  Because the allegations in these claims were presented on direct appeal, it must be determined if the Arizona Supreme Court's rejection of the claims is contrary to or an unreasonable application of clearly established federal law.

**Claim 3:**

Petitioner alleges that his equal protection and due process rights under the Fourteenth Amendment to the United States Constitution were violated when the trial court refused to grant him an ex parte hearing on his motion to obtain a forensic pathologist to assist in his defense.  (Dkt. 154 at 46-60.)

Background:

Prior to trial, defense counsel, joining motions filed by Rudi Apelt, made requests for ex parte proceedings, arguing that such proceedings were necessary "to keep confidential certain steps in the preparation of his defense" and were authorized pursuant to *Ake v. Oklahoma*, 470 U.S. 68 (1985).  (ROA 106; *see* ROA 205.)  The trial court denied the requests, finding there was no authority allowing the court to hold ex parte hearings.  (ROA 124, 225; RT 1/12/90 at 57.)

On direct appeal the Arizona Supreme Court rejected Petitioner's claim of an *Ake* violation:

> We agree with the trial court that there is no authority for granting an indigent defendant an *ex parte* hearing regarding his or her need for expert assistance.  None of the cases cited by defendant establishes such a right. Federal cases are not helpful because 18 U.S.C. § 3006A(e) expressly authorizes *ex parte* applications and proceedings in federal court.  We are aware of no comparable state statute.  Nor do we believe that a reference to *ex parte* proceedings in *State v. Fisher*, 152 Ariz. 116, 118, 730 P.2d 825, 827 (1986) is authority for a *right* to such proceedings.
>
> In addition, we do not believe that the Fourteenth Amendment's

- 15 -

guarantees of due process and equal protection encompass such a right. Neither due process nor equal protection requires that the state equalize the resources of the indigent and the wealthy defendant. *Ross v. Moffitt,* 417 U.S. 600, 616 (1974). Rather, they guarantee the indigent an opportunity to present his or her claims adequately and fairly. *Id.* To put it another way, they assure the indigent defendant access to the "basic tools" of an adequate defense. *Ake v. Oklahoma,* 470 U.S. 68, 77 (1985).

Arizona affords the criminal defendant the right to expert assistance at county expense upon a showing of need. Given the broad disclosure required by the Arizona Rules of Criminal Procedure, an *ex parte* hearing on the defendant's request for assistance would be potentially helpful to the indigent defendant only when the expert's analysis turns out to support a position contrary to that of the defendant.

When we balance the potential benefit in some few cases against the harm inherent in *ex parte* proceedings, we cannot conclude such a proceeding is constitutionally required. It is not one of the "basic tools" of an adequate defense. We therefore hold that the trial court did not err by refusing to hold an *ex parte* hearing on defendant's need for expert assistance.

We further note that, even if defendant had a due process right to an *ex parte* hearing, he could not show prejudice from the trial court's denial of it. The trial court did not prevent defendant from presenting requests for expert assistance, as defendant claims, but merely from presenting them *ex parte.* If defendant required assistance, he should have requested it. Furthermore, if he had been prejudiced by being forced to present these requests in the presence of the state, he could then argue on appeal that his due process rights were violated.

*Apelt*, 176 Ariz. at 365, 861 P.2d at 650 (footnotes omitted).

<u>Analysis:</u>

In support of this claim, Petitioner relies on the Supreme Court's decision in *Ake*. In *Ake*, the Court held that due process requires the state to provide an indigent defendant access to one competent psychiatrist when the defendant demonstrates that "his sanity at the time of the offense is to be a significant factor at trial." *Ake*, 470 U.S. at 83.

Petitioner's assertion that he is entitled to habeas relief based on an *Ake* violation fails on several grounds. First, the Supreme Court "has not yet extended *Ake* to non-psychiatric experts." *Conklin v. Schofield*, 366 F.3d 1191, 1206 (11th Cir. 2004); *see Caldwell v. Mississippi*, 472 U.S. 320, 323 n. 1 (1985) (Court declined to extend *Ake*'s holding to the appointment of a criminal investigator, fingerprint expert, and ballistics expert, stating "we have no need to determine as a matter of federal constitutional law what *if any* showing

would have entitled a defendant to assistance of the type sought here") (emphasis added). Next, Petitioner has cited no clearly established federal law under which he was constitutionally entitled to an ex parte hearing – certainly *Ake* does not stand for this proposition. Finally, even if he were entitled under *Ake* to an ex parte hearing regarding the appointment of a forensic pathologist, Petitioner has not attempted to show that he suffered prejudice from the court's refusal to hold such proceedings.

To support the assertion that he was prejudiced by the court's failure to allow an ex parte hearing, Petitioner relies on the developments in his brother's subsequent trial. In Rudi's case, the trial court, while denying the request for an ex parte hearing, granted the motion to appoint an expert. (CR-91-0025-AP, ROA 296.) At trial, Dr. Vincent DiMaio, a forensic pathologist from Texas, testified that the victim's wounds were produced by a single – most likely right-handed – assailant. (RT 8/28/90 at 47, 76.) Evidence was then elicited to show that Rudi Apelt was right-handed and Petitioner left-handed.

While Dr. DiMaio's testimony would have benefitted Petitioner, the trial court did not prevent him from obtaining Dr. DiMaio's services. Instead, as the Arizona Supreme Court noted, the trial court simply rejected Petitioner's request to use the mechanism of an ex parte hearing to obtain the appointment of an unidentified expert. Petitioner did not suffer prejudice from the trial court's actions because the court did not prevent him from gaining the expert testimony he now wishes had been presented. Moreover, the "potentially helpful" aspect of an ex parte hearing was not available to Petitioner, because Dr. DiMaio's testimony did not "support a position contrary to" his defense. *Apelt*, 176 Ariz. at 365, 861 P.2d at 650.

For these reasons, the Arizona Supreme Court did not unreasonably apply clearly established federal law when it denied this claim. Therefore, Petitioner is not entitled to relief on Claim 3.

**Claim 8:**

Jurors observed Petitioner in shackles during his daily walk between the jail and the courthouse. He alleges that this violated his rights as guaranteed by the Fifth, Sixth, and

Fourteenth Amendments to the United States Constitution. (Dkt. 154 at 69.)

Background:

Petitioner filed a pretrial motion to preclude shackling. (ROA 145.) The trial court addressed the motion as follows:

> That will be a determination that will be decided at the time of trial, and I will have the Sheriff's Office people involved in that decision. They may have information they want to present to me. I am well aware of the fact that the defendants should not be shackled any more than necessary to preserve the security of the courtroom. That is my ruling on the Motion to Preclude Shackling.

(RT 1/9/90 at 61; *see* ROA 215.)

On the seventh day of trial Petitioner informed the court that four jurors had seen him in shackles and handcuffs as he was being escorted from the courthouse to the jail.[8]  (RT 4/26/90 at 2.) Defense counsel asked the court to question the jurors to determine if they saw Petitioner in shackles and, if so, whether that would affect their ability to render a fair and impartial verdict. (*Id.* at 5.)

Upon being presented with this information, which included the State's explanation for the security measures, the trial court responded:

> I would like to state for the record that the information received by the Court was general in nature but it emanated apparently from an inmate of the jail who passed the information on to his attorney, who in turn passed the information on. It eventually ended up with me, and that was that there had been discussions in the jail amongst apparently one or more of the Apelt brothers and other inmates . . . about a potential jail break.
>
> Now, these types of comments don't bother me in the least. I think that is probably a standard topic of conversation when people are sitting in the jail, but out of an abundance of caution and because of the rumors, I have directed that the Sheriff take certain steps toward security, and I think the security that has been existing here is adequate and appropriate, not in excess of what may be required to insure a fair and safe trial for everybody, including the defendant. The fact that he is handcuffed and shackled going back across the

---

[8]    In his third motion to expand the record, Petitioner included an affidavit from his investigator. (Dkt. 153, Ex. 10.) According to this document, the investigator spoke with two jurors, one of whom indicated that he and the other jurors had observed Petitioner in shackles as he was escorted to and from the jail outside the courthouse. (*Id.*) This Court denied the motion to expand the record with respect to Claim 8 because Petitioner was not diligent in developing its factual basis in state court. (Dkt. 180 at 6.)

alleyway, that started yesterday, I don't know why it didn't start the first day. I mean everybody on the jury knows that somebody who is in jail is going to be handcuffed when they are brought to the courtroom. He was taken across the alley. I don't see anything harmful in that.

I don't think it's appropriate to draw the jury's attention to that by calling them in and asking them if they are prejudiced by it. I agree with the prosecutor, if somebody is in jail, they are not going to be walking around at their own pleasure.

(RT 4/26/90 at 6-7.)

On direct appeal, the Arizona Supreme Court rejected the claim that Petitioner's rights were violated when the jurors were exposed to the sight of him in shackles or by the trial court's response to the issue:

Precautions should be taken to keep the jury from seeing a defendant in shackles because of potential prejudice. Precautions were taken in this case. In spite of these precautions, however, several members of the jury allegedly saw the defendant in restraints. When such exposure is alleged, one course is for the trial court, upon request, to take some corrective action, such as questioning the jurors to determine whether they were actually prejudiced by the sight, or by giving a cautionary instruction. In this case, however, the trial court refused the defendant's request for corrective action. The court noted that the jury already knew Michael was in jail, and thus would expect some restraints. Furthermore, questioning them about it would tend to emphasize the presence of restraints. The court's determination that corrective action would do more harm than good under the circumstances of this case was well within its discretion.

The question is therefore whether, with or without any action by the court, having been seen in restraints deprived defendant of a fair trial. We hold that the brief and inadvertent exposure of a handcuffed or shackled defendant to members of the jury outside the courtroom is not inherently prejudicial, and the defendant is not entitled to a new trial absent a showing of actual prejudice. *See, e.g., United States v. Halliburton,* 870 F.2d 557, 560-61 (9th Cir.1989), *cert. denied,* 492 U.S. 910, 109 S.Ct. 3227, 106 L.Ed.2d 575 (1989); *United States v. Figueroa-Espinoza,* 454 F.2d 590 (9th Cir.1972); *United States v. Ware,* 897 F.2d 1538, 1541-42 (10th Cir.1990), *cert. denied,* 496 U.S. 930, 110 S.Ct. 2629, 110 L.Ed.2d 649 (1990). No such showing has been made in this case. Even though the trial court refused to question the jurors who purportedly saw defendant in restraints, this did not preclude defendant from seeking to make an evidentiary record after trial. *See United States v. Garcia-Rosa,* 876 F.2d 209, 236 (1st Cir.1989) (though remedial action is generally preferred, the court's refusal to poll the jury or grant mistrial after a juror saw defendant in restraints in the hallway was not error absent a showing of prejudice; defendant could have requested a post-trial voir dire of jury), *cert. granted and judgment vacated on other grounds, Rivera-Feliciano v. United States,* 498 U.S. 954, 111 S.Ct. 377, 112 L.Ed.2d 391 (1990). The defendant made no such record. Nor has he shown us how we could find prejudice.

*Apelt,* 176 Ariz. at 360-61, 861 P.2d at 645-46.

- 19 -

1    <u>Analysis:</u>

2         The Due Process Clause forbids the routine use of physical restraints visible to the

3    jury. *Deck v. Missouri*, 544 U.S. 622, 626 (2005). The use of restraints requires a

4    determination by the trial court that the restraints are justified by a specific state interest

5    particular to the defendant's trial.[9] *Id.* at 629; *see Ghent v. Woodford*, 279 F.3d 1121, 1132

6    (9th Cir. 2002) (criminal defendant has a constitutional right to be free of shackles in the

7    presence of the jury absent an essential state interest that justifies the physical restraints);

8    *Rhoden v. Rowland*, 172 F.3d 633, 636 (9th Cir. 1999) (same). This is because a "jury's

9    observation of a defendant in custody may under certain circumstances 'create the impression

10   in the minds of the jury that the defendant is dangerous or untrustworthy' which can unfairly

11   prejudice a defendant's right to a fair trial notwithstanding the validity of his custody status."

12   *United States v. Halliburton*, 870 F.2d 557, 559 (9th Cir. 1989) (quoting *Holbrook v. Flynn*,

13   475 U.S. 560, 569 (1986)).

14        To obtain habeas relief, a court must first find that the defendant was physically

15   restrained in the presence of the jury, that the shackling was seen by the jury, and that the

16   physical restraint was not justified by state interests. *Ghent*, 279 F.3d at 1132. A jury's

17   "brief or inadvertent glimpse" of a shackled defendant is not inherently or presumptively

18   prejudicial. *Id.* at 1133; *see also Duckett v. Godinez*, 67 F.3d 734, 749 (9th Cir. 1995) (claim

19   of unconstitutional shackling subject to harmless-error analysis); *United States v. Olano*, 62

20   F.3d 1180, 1190 (9th Cir. 1995). An unjustified decision to restrain a defendant at trial

21   requires reversal only if the shackles or handcuffs had "substantial and injurious effect or

22   influence in determining the jury's verdict." *Castillo v. Stainer*, 983 F.2d 145, 148 (9th Cir.

23   1992), *amended by* 997 F.2d 669 (9th Cir. 1993) (quoting *Brecht v. Abrahamson*, 507 U.S.

24   619, 623 (1993)).

25   _____

26        [9]     As the trial court noted, the restraints were used because of concerns about
     Petitioner's involvement in possible escape attempts. (RT 4/26/90 at 7.) Because this Court
27   has determined that Petitioner has not demonstrated the required prejudice, the Court need
28   not address whether the use of the restraints was justified.

1    This Court agrees with the Arizona Supreme Court that the jurors' brief and
2    inadvertent view of Petitioner in shackles outside the courthouse was not inherently
3    prejudicial.  The Court also agrees that Petitioner has not demonstrated prejudice, and that
4    such a showing would be difficult, given that the jurors were aware that Petitioner was in
5    custody and were unlikely to be surprised that a person on trial for first-degree murder would
6    be restrained as he was led to and from the jail.  *See, e.g.*, *United States v. Diecidue*, 603 F.2d
7    535, 549 (5th Cir. 1979) ("The conditions under which defendants were seen were routine
8    security measures rather than situations of unusual restraint such as shackling of defendants
9    during trial.").  Similarly, in *Ghent* the district court found that the defendant was transported
10   to and from the courtroom in shackles and that on some of these occasions jurors observed
11   him under such restraint.  279 F.3d at 1132.  The jurors glimpsed Ghent as he walked in the
12   hallway and stood at the doorway of the courtroom to have his restraints removed.  *Id.*  On
13   appeal, the Ninth Circuit held that "the jury's 'brief or inadvertent glimpse' of a shackled
14   defendant is not inherently or presumptively prejudicial, nor has Ghent made a sufficient
15   showing of actual prejudice."  *Id.* at 1133.

16   Here, the jurors observed the routine process of Petitioner being escorted to and from
17   the jail in shackles.  Inside the courtroom, Petitioner was dressed in street clothes and was
18   not visibly restrained.  Under these circumstances, the state courts reasonably determined that
19   Petitioner did not show that he was actually prejudiced by the jurors' observations.

20   Because the decision of the Arizona Supreme Court was not an unreasonable
21   application of clearly established federal law, Petitioner is not entitled to relief on Claim 8.

22                          **CERTIFICATE OF APPEALABILITY**

23   Although this is not a final order in these proceedings, the Court has endeavored to
24   determine, if judgment is ultimately entered against Petitioner, whether a certificate of
25   appealability (COA) should be granted on the issues addressed herein.  Pursuant to 28 U.S.C.
26   § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of
27   the denial of a constitutional right."  This showing can be established by demonstrating that
28   "reasonable jurists could debate whether (or, for that matter, agree that) the petition should

have been resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).  For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right, and (2) whether the court's procedural ruling was correct.  *Id.*

The Court finds that reasonable jurists could not debate its analysis of Claims 3 and 8.  The Court further finds, for the reasons set out in previous orders, that reasonable jurists could not debate the Court's dismissal of the remainder of Petitioner's conviction-related claims as procedurally barred or non-cognizable. (Dkts. 132, 180.)  Accordingly, the Court does not intend to issue a COA on any of these issues in the event judgment is ultimately entered against Petitioner.  Petitioner may seek reconsideration of this determination within any motion for reconsideration from this Order.

### CONCLUSION

The Court, having considered Claims 3 and 8, concludes that Petitioner is not entitled to federal habeas relief on these conviction-related claims.  The Court further finds, with respect to these claims, that an evidentiary hearing is neither warranted nor required.

Accordingly,

**IT IS HEREBY ORDERED** that Claims 3 and 8 of Petitioner's Second Amended Petition for Writ of Habeas Corpus (Dkt. 63) are **DENIED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that if, pursuant to LRCiv. 7.2(g), Petitioner or Respondents file a Motion for Reconsideration of this Order, such motion shall be filed within fifteen (15) days of the filing of this Order.

**IT IS FURTHER ORDERED** that Petitioner's sentencing-related claims remained stayed pending further order of this Court.

**IT IS FURTHER ORDERED** that the Clerk of the Court forward a copy of this Order to all counsel of record, to Petitioner and to the Clerk of the Arizona Supreme

1    Court, 1501 W. Washington, Phoenix, AZ 85007-3329.

2         DATED this 16th day of June, 2008.

3

4

5

6                                   Roslyn O. Silver
                         United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28