**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Michael Apelt,

               Petitioner,

v.

Charles L. Ryan,

               Respondent.

No. CV-98-00882-PHX-ROS

**ORDER**

Michael Apelt is an Arizona death row inmate seeking federal habeas relief under a wide variety of theories.  The Court previously rejected most of Apelt's conviction-related claims.  (Doc. 210.)  This Order addresses his remaining conviction-related claim and all of his sentencing-related claims.

**BACKGROUND**

Because this order deals almost exclusively with Apelt's sentencing claims, a full explanation of his crimes and trial is unnecessary.  In brief, Apelt, his brother Rudi, Rudi's wife, and Apelt's some-time girlfriend Anke Dorn, traveled from their native Germany to America in August 1988.  In California and then in Arizona the brothers and Dorn embarked on a series of "cons" involving the brothers trying to entice women into romantic relationships by holding themselves out as successful businessmen.  The

brothers hoped to obtain money from these relationships.  On October 6, 1988, Apelt met Cindy Monkman.  A relationship developed and, on October 28, 1988, Cindy and Apelt were married in Las Vegas.

Immediately after the marriage Apelt insisted the couple take out life insurance on Cindy.  The couple had difficulty obtaining the size of policy Apelt wanted and so it was not until December 22, 1988, that a large policy for Cindy was approved.  The very next day, Apelt, Rudi, and Dorn agreed to kill Cindy.  That evening, Apelt drove Cindy to a remote location where he met Rudi who had traveled there in a separate car with Dorn.  Dorn stayed in the car while Apelt and Rudi murdered Cindy.  After the murder Apelt, Rudi, and Dorn went out to dinner.

Cindy's body was found on the afternoon of December 24.  She had been stabbed once in the lower chest and four times in the back.  Her throat had been slashed so deeply that her head was nearly severed from her body.  There were numerous bruises on her face and body.

Almost immediately the police suspected Apelt and Rudi were involved.  The police questioned the brothers but they denied any involvement.  When the police questioned Dorn, however, she confessed.  Both Apelt and Rudi were arrested and tried separately.  Dorn was granted immunity and testified at both trials.  Apelt was represented at trial by attorney Michael Villareal.  A jury found Apelt guilty of conspiracy to commit first-degree murder and first-degree murder.  The judge then set the

matter for sentencing.[1]

On June 8, 1990, in anticipation of the hearing regarding aggravation and mitigation, Villareal filed a motion to authorize extraordinary expenses "to travel to Germany in order to locate and contact witnesses regarding Michael Apelt's past life in order to establish mitigating factors." (ROA 298.) Villareal also filed a motion seeking an interpreter to assist him in Germany (ROA 297) and a 60-day continuance of the aggravation/mitigation hearing based on the need to conduct additional investigation. (ROA 296; RT 6/11/90 at 3–6.) In support of these requests, Villareal argued he needed to "locate and contact witnesses regarding [Apelt's] past life in order to establish mitigating factors. This work must be undertaken in Germany as [Apelt] was born and raised there and his contacts in the United States are minimal." (ROA 296.)

At a hearing on June 11, 1990, Villareal explained to the court that, at some point during the prosecution, his co-counsel had gone to Germany at her own expense as part of a family vacation. As described by Villareal, that trip was an attempt to "build[] up a character defense." While there, co-counsel had looked into Apelt being in "some type of psychological institution early in his life." Co-counsel had not uncovered any information that Villareal used at trial but Villareal argued it was now "important and necessary . . . that [he] travel . . . to Germany to locate and contact witnesses there." Villareal explained he planned to "explore" the "issue of that psychological

---

[1] Rudi was also convicted of first degree murder and conspiracy to commit first degree murder. Rudi was sentenced to death for the murder conviction. *State v. (Rudi) Apelt*, 176 Ariz. 369, 371, 861 P.2d 654, 656 (1993). In 2009, however, a state court found Rudi intellectually disabled and vacated his death sentence. (Doc. 285, Ex. 27.)

hospitalization."  In addition, Villareal needed to "check into" "other matters that came to light in [Apelt's] past regarding a difficult child birth, things of [that] sort."  (RT 6/11/90 at 7–8.)  Villareal stressed that he had "leads" in Germany and was not "going over there on a fishing expedition."  (*Id.*)  Finally, Villareal explained he had sought assistance from the German consulate but had learned the German government would not become involved in the case unless Apelt had been sentenced to death.  (*Id.* at 9–10.)

The court granted the request for additional time but denied Villareal's request for travel funds.  In doing so, the court noted the case had already been "very expensive" and it ordered Villareal to submit a "verification as to those items that you feel that your trip to Germany is a necessity for."  (*Id.* at 10.)  Villareal never submitted the "verification" the court requested and the court later formally denied the motion.  The order denying the motion explained the "extra expense of funds has not been demonstrated as a necessity [sic] for the defense of the defendant."  (ROA 302.)

On July 31, 1990, a week before Apelt's rescheduled aggravation/mitigation hearing, Villareal again moved for a continuance and renewed his request for funds to travel to Germany.  (ROA 307; *see* RT 8/7/90 at 4.)  Villareal stated he had "not been able to investigate [Apelt's] background in order to ascertain what mitigating evidence exists."  (ROA 307.)  He explained it was "obvious that any mitigating evidence [would] only be found in Germany" and that it was "impossible" for him "to know with any reasonable certainty what [would] be uncovered when a thorough background check . . . is undertaken."  (*Id.*)  The court did not rule on the motion prior to the hearing.

- 4 -

At the aggravation/mitigation hearing, Villareal argued in support of his motion by informing the court he had been unable "to prepare a proper mitigation" case because the court had denied his funding request.  (RT 8/7/90 at 5.)  Villareal, apparently reading from a booklet authored by a defense organization, outlined "the types of things that are obvious in a mitigation hearing" and that he would investigate if he traveled to Germany. Those things included "documentary evidence, . . . birth records, school records, mental health records, hospital records, institutional records, juvenile prisons, jails, mental hospitals, military records, court records, any prior pre-sentence report, prior mental health evaluations, probation records, [and] parole records."  Villareal also stated he wished to interview witnesses in an "exhaustive search to find evidence in mitigation that . . . the defendant himself may not know would be relevant to present to a court in a pre-sentence hearing of this nature."  For example, Villareal wished to talk to "parents, siblings, all other relatives, teachers, . . . employers, co-workers, . . . mental health professionals, . . . [and] any persons that other people may notify me of who could be helpful in the investigation for mitigating evidence."  (*Id.*)  Despite this lengthy list of evidence and witnesses, Villareal did not provide *specifics* regarding Apelt's life and situation or the witnesses he wished to interview.

The state did not take a position on the funding issue but opposed delaying the aggravation/mitigation hearing any further.  The state pointed out that Villareal had failed to make the showing of necessity required by the court's prior order.  (*Id.* at 7–8.)  The court then denied the motion, finding Villareal had not offered a "valid reason" to travel

to Germany or to further continue the hearing.  (*Id.* at 9.)  The aggravation/mitigation hearing proceeded.

The hearing began with the state presenting its aggravation case.  During its presentation, the prosecutor called a police officer to testify.  According to that officer, he and the prosecutor had traveled to Germany in search of aggravating evidence.  The officer explained that during the trip to Germany, he had uncovered evidence of Apelt's criminal record, including a felony burglary conviction.  (RT 8/7/90 at 16–22, 26.)  The officer further explained he had spoken with Apelt's ex-wife and she had stated Apelt "would go over dead bodies to obtain money."  The ex-wife also claimed Apelt had asked her to donate a kidney for money.  (Doc. 326-2 at 24.)  Finally, the officer explained that he had spoken with Dorn's parents who had informed him that they considered Apelt so dishonest that they once threatened to shoot Apelt if he visited their home.  (*Id.* at 23–25, 27.)

After the officer's testimony, the state presented its argument.  The prosecutor claimed there were "no mitigating factors" and the case did not involve any "of the factors that are so frequently offered to avoid the death penalty, such as poor childhood."  To stress this point, the prosecutor pointed out that Apelt "himself told the probation officer that he had a normal childhood."[2]  (Doc. 326-2 at 34.)  The prosecutor further

---

[2] This reference regarding the probation officer was based on a pre-sentencing report prepared after the probation officer interviewed Apelt.  During the interview Apelt had refused to discuss the crime but he had discussed his family history.  Apelt had told the probation officer "there was no trouble in [his parents'] marital relationship" and he did not mention any "problems that occurred during his childhood years."

stated "there is no evidence of any mental disease or defect such that might mitigate his crime and call for leniency." (Doc. 326-2 at 34.) The prosecutor ended her argument by claiming Apelt was a "psychopath or a sociopath" and by reiterating "there are no mitigating factors." (Doc. 326-2 at 35.) It was then Villareal's turn to present a mitigation case.

Villareal's argument and presentation of evidence in mitigation was very weak. One of Villareal's first claims was a strange argument that the state had not established Apelt's crime was especially cruel. According to Villareal, the "many stab wounds" were due to Cindy's "strong struggle to survive," and that struggle "made the crime not cruel, not heinous, not depraved, but made it difficult." (Doc. 326-2 at 40). Villarreal then asked the court to find as mitigating circumstances Apelt's age, remorse, new-found Christian faith, lack of a serious criminal record, military service, good behavior at trial, and the immunity agreement granted to Dorn. (*Id.* at 41–52.) He also asked the court consider the wishes of Cindy's sister and friend that Apelt not receive the death penalty, the fact that Germany had abolished the death penalty, and the alleged disproportionality of the death penalty in this case as compared to other murder cases. (*Id.*) Finally, Villareal argued generally that there were mitigating factors relating to Apelt's background—including mental-health issues, a difficult childhood, low intelligence, and lack of education—that he could not present because the court had denied his motion for funds to travel to Germany. (*Id.* at 47-48.)

Villareal introduced eight exhibits he was somehow able to obtain from Germany.

The eight exhibits were:

1. A letter from Apelt's brother disputing that Apelt could have been involved in the murder;

2. A letter from one of Apelt's friends stating Apelt had been a "good and honest friend";

3. A letter from Apelt's uncle stating he had known Apelt since childhood and Apelt had been raised to "become [a] good human being[]";

4. A letter from Apelt's mother stating, in part, "Even though my sons had contact with the law, they were never capable of such violence.  I can just say as their mother, that they grew up normally.";

5. A letter from Apelt's sister stating "my brothers are and were no angels but it takes a lot to commit such a brutal crime" and "I do not believe that my brothers are able to commit such a mine [sic] and brutal crime.";

6. A letter from a doctor stating Apelt "was treated for various illnesses" between August 1984 and July 1988;

7. A letter from a past employer stating Apelt's behavior from September 1984 to February 1987 was "unobjectionable"; and

8. A certificate from the German military stating Apelt had served from 1982 to 1983.

After hearing all of the evidence, the court set the formal sentencing for the following week.

At the sentencing, the trial court found three aggravating factors had been proven: Apelt procured Cindy's murder with the promise of pecuniary gain, *see* A.R.S. § 13-703(F)(4); murdered Cindy with the expectation of pecuniary gain, *see* A.R.S. § 13-703(F)(5); and murdered Cindy in an especially cruel, heinous or depraved manner, *see*

A.R.S. § 13-703(F)(6).[3]   (RT 8/13/90 at 7.)  The court found no mitigation sufficiently

substantial to warrant leniency and sentenced Apelt to death.  (*Id.* at 8–9, 12–13.)  Apelt

appealed.

Villareal handled Apelt's direct appeal.  While that appeal was pending, Villareal

filed a petition for post-conviction relief ("PCR").  That petition was based on newly-

discovered evidence that allegedly exonerated Apelt.[4]  The trial court eventually denied

the PCR petition and Apelt petitioned the Arizona Supreme Court for review.  *See State*

*v. Apelt*, 861 P.2d 634, 638 (Ariz. 1993).  The Arizona Supreme Court consolidated the

petition for review with Apelt's still-pending direct appeal.  *Id.*  On November 9, 1993,

the Arizona Supreme Court rejected all of the claims in the petition and appeal and

affirmed Apelt's death sentence.

The Arizona Supreme Court filed a petition for post-conviction relief on Apelt's

behalf and Apelt received new counsel for that petition.  Because Villareal had already

---

[3]  In 2008, the Arizona Legislature reorganized and renumbered Arizona's sentencing statutes.  *State v. Chappell*, 225 Ariz. 229, 234, n.3, 236 P.3d 1176, 1181 (2010).  The Court cites the version in use at the time of Apelt's trial.

[4]  It is worth pointing out that there was no understandable reason for Villareal to file, immediately after trial, a very limited PCR.  At that time, Arizona courts allowed for PCR petitions to be filed while a direct appeal was pending.  *See State v. Valdez*, 770 P.2d 313, 319 (Ariz. 1989).  Those PCR petitions could include allegations of ineffective assistance of counsel.  *Id.*  However, counsel had to be careful when filing a PCR petition because the failure to assert claims in a prisoner's first PCR petition could result in that claim being precluded later.  *State v. Gaffney*, 589 P.2d 914, 915 (Ariz. Ct. App. 1979) (discussing preclusion of matters not raised in first PCR).  Moreover, it was well-established as of 1990 that counsel should not present claims asserting his own ineffectiveness.  *State v. Suarez*, 670 P.2d 1192, 1204 (Ariz. Ct. App. 1983) (noting "it is improper for appellate counsel to argue his own ineffectiveness at trial").  Based on this, Villareal's decision to file a PCR petition immediately after trial, limited to an evidentiary matter, was rather unusual.  The record contains no explanation for this decision.

filed one such petition while the direct appeal was pending, this was Apelt's second PCR. Apelt's new counsel ("PCR counsel") argued Villareal's performance had been both deficient and prejudicial under *Strickland v. Washington*, 466 U.S. 668 (1984). (ROA PCR 2, Item 19.) As relevant here, PCR counsel contended Villareal performed deficiently by failing to support his request for funds to travel to Germany with a more specific factual and legal showing of why the trip was reasonably necessary to Apelt's defense. (*Id.* at 4). PCR counsel also claimed Villareal performed deficiently by failing "to investigate the mitigation through less expensive and more practical means, such as hiring a German investigator in Germany." (*Id.* at 7).

In support of these claims regarding Villareal's performance, PCR counsel pointed out Villareal had been aware Apelt had been hospitalized in Germany but Villareal "failed to gather the records and background information necessary for a thorough and complete mental health evaluation." Villareal had also "failed to investigate, develop, and present substantial mental health evidence"; failed "to identify, locate and investigate potential mitigation witnesses"; and "failed to properly develop or present adequately expert testimony." (*Id.* at 4–5.) PCR counsel further claimed Villareal had failed to present evidence that Apelt "came from a family background of gross poverty, alcoholism and violence which included emotional, physical and sexual abuse"; that Apelt "has a history of mental illness and has received psychiatric/psychotherapeutic treatment in Germany"; that Apelt "was in special education as a child," "suffered from a nervous disorder," and had attempted suicide; and that Apelt was "mentally, physically,

and sexually abused by older men throughout his childhood and mentally disturbed while in school." (*Id.* at 10-11.)

These claims by PCR counsel were supported by "a plethora of documents from Germany obtained by . . . counsel thorough correspondence." (*Id.* at 10.) The documents submitted by PCR counsel included a "report on the situation of the Apelt family," prepared by the Dusseldorf Industrial Welfare Organization. The report was based on information provided by Apelt's mother and the social worker who had worked with the family when Apelt was a child. (*Id.*, Ex. 2(a).) The documents also included an affidavit from Apelt's mother. (*Id.*, Ex. 2(d).) The report and affidavit recounted what follows.

Apelt's father was an abusive alcoholic who beat his wife and children, including Apelt, with an iron rod. (*Id.*, Ex. 2(a) at 4.) Apelt's father sexually abused his wife and attempted to engage in sexual misconduct against his daughters. (*Id.*) As a child, Apelt was sexually molested by older men on two occasions. (*Id.*, Ex. 2(d).) The first time was when Apelt was seven. He was taken from his yard and driven to a house where he was forced to have intercourse. (*Id.*) The second time was when Apelt was thirteen. Apelt had been walking home from school when he and a friend were tricked into going into a cellar where a man holding a knife forced Apelt to have intercourse. (*Id.*) The incidents left Apelt "mentally disturbed." (*Id.*)

Apelt's family was very poor while he was growing up. The family of nine lived in a five-bedroom apartment and his father did not work on a regular basis. The family survived on government support and his mother's earnings as a cleaning lady. (*Id.*) The

children were forced to go to work at age fourteen.  (*Id.*)  All of the Apelt children "immediately after reaching emancipation, left home in order to escape the abusive, sexually abusive and violent situations." (*Id.*)

Beyond the report from the governmental agency and affidavit from Apelt's mother, PCR counsel also submitted a medical report from the Psychosomatic Clinic in Dusseldorf where Apelt had received in-patient treatment.  (*Id.*, Ex. 2(b).)  That medical report was from 1986 and it described Apelt as suffering from "shortness of breath, vertigo, and pain in the left arm."  (*Id.* at 1.)  The report indicated Apelt may have suffered medical complications during his birth.  (*Id.* at 2.)  The report recounted that Apelt had attended special education because he spoke with a lisp.  (*Id.* at 2.)

Finally, PCR counsel included an affidavit from Villareal in which he attested that "[a]ny lack of investigation during the penalty phase . . . was not a tactical or strategic decision."  (Doc. 326, Ex. 34.)  Without any elaboration, Villareal averred Apelt "did not take an active role in the development of mitigation." (*Id.*)

Based on this new evidence, PCR counsel moved for an evidentiary hearing on Apelt's ineffective assistance claims.  (*Id.* at 9.)  The PCR court denied the request for a hearing and rejected all of the claims in the petition.  On the ineffective assistance of counsel claims, the court held the claims were procedurally improper because they had not been presented in the first PCR.  Alternatively, the court held Apelt's claims of ineffective assistance of counsel at sentencing were not

>colorable . . . because Apelt fails to make a sufficient preliminary showing
>that counsel's performance fell below objective standards of

- 12 -

1
2
3

> reasonableness, and fails to make a preliminary showing that, in light of the
> allegations, there exists a reasonable probability that the result of the trial or
> sentencing hearing would have been different.

4

(ROA PCR 2, Item 42 at 2.)

5
6

Following denial of a motion for rehearing, the PCR court permitted PCR counsel

7

to withdraw but denied Apelt's request to reopen the PCR proceeding.  (ROA PCR 2, at

8

Items 62, 63.)  After obtaining new counsel, Apelt filed a petition for review with the

9

Arizona Supreme Court.  In support of that petition, Apelt's new counsel submitted a

10
11

psychiatric report prepared by Dr. Herschel Rosenzweig.  (*Id.* at Ex. E.)  Dr. Rosenzweig

12

did not arrive at clear diagnoses but suggested the following possible diagnoses:

13
14

attention-deficit disorder; post-traumatic-stress disorder; personality change due to

15

organic brain damage; learning disorder not otherwise specified; borderline intellectual

16

functioning; and personality disorder not otherwise specified.  (*Id.* at 9.)  The Arizona

17

Supreme Court summarily denied review.

18
19

Apelt filed his federal petition for writ of habeas corpus on May 14, 1998.  (Docs.

20

1, 46, 63.)  Before this Court could resolve the petition, the United States Supreme Court

21

decided *Atkins v. Virginia*, 536 U.S. 304, 321 (2002).  In *Atkins*, the Supreme Court held

22
23

the Eighth Amendment prohibits states from executing intellectually disabled persons.

24

Based on the possibility that *Atkins* applied to Apelt, this Court stayed Apelt's

25

sentencing-related claims to permit him to return to state court and exhaust an *Atkins*

26

claim.   (Doc. 117.)   In the meantime, this Court considered and denied Apelt's

27
28

conviction-related claims.  (Docs. 132, 180, 210.)

Following an evidentiary hearing, the state court rejected Apelt's *Atkins* claim. (*See* Doc. 285, Ex. 27.)  Apelt was then permitted to amend his federal habeas petition to raise an *Atkins* claim.  (Doc. 275.)  This Court also dismissed, in whole or in part, six of Apelt's sentencing-related claims on procedural grounds, six as plainly meritless, and one as not cognizable on habeas review.  (*Id.*)  The Court ordered merits briefing on the remaining claims: Claims 11, 14, 15, 17, 26, and 27.  (*Id.*)  Subsequently, the Court granted Apelt's motion for supplemental briefing and ordered the parties to address, in light of another United States Supreme Court decision, the procedural default and merits of Claims 1-B, 1-D, and 12.  (Doc. 315.)  The parties submitted the supplemental briefing and all of Apelt's remaining claims are now ripe for resolution.

## DISCUSSION

Deciding Apelt's claims requires resolution of two preliminary issues.  First, the Court must determine the procedural status of the claims.  That is, the Court must decide which specific claims Apelt raised in state court and how they were resolved on their merits.  Second, the Court must determine the standard that applies to the claims raised and resolved in state court.  Only after deciding these preliminary issues can the Court examine the merits of Apelt's claims.

## I.  Procedural Status of Claims

"State prisoners seeking a writ of habeas corpus from a federal court must first exhaust their remedies in state court."  *Woods v. Sinclair*, 764 F.3d 1109, 1129 (9th Cir. 2014).  To exhaust claims, a petitioner must "present his claims to the highest court of the

- 14 -

1

2   state." *Cooper v. Neven*, 641 F.3d 322, 326 (9th Cir. 2011) (quotation omitted).  And if

3   "a petitioner tries to present a claim to the state court but is prevented from doing so by

4   his failure to comply with a state procedural rule, the claim is 'technically exhausted' but

5   procedurally defaulted." *Nguyen v. Curry*, 736 F.3d 1287, 1292 (9th Cir. 2013).  When a

6   claim is procedurally defaulted, a federal court usually cannot reach the merits of that

7   claim.  *Smith v. Baldwin*, 510 F.3d 1127, 1139 (9th Cir. 2007).

8

9          Before 2012, the procedural default of a particular claim would be excused "only

10  if a habeas petitioner [could] demonstrate both 'cause' for the default and resulting

11  'prejudice.'" *Nguyen*, 736 F.3d at 1292.  But in 2012, the Supreme Court altered the

12  landscape for some claims regarding ineffective assistance of counsel.  In *Martinez v.*

13  *Ryan*, 132 S. Ct. 1309 (2012), the Court explained:

14

15

16          Where, under state law, claims of ineffective assistance of trial counsel
           must be raised in an initial-review collateral proceeding, a procedural
17         default will not bar a federal habeas court from hearing a substantial claim
           of ineffective assistance at trial if, in the initial-review collateral
18         proceeding, there was no counsel or counsel in that proceeding was
           ineffective.
19

20  *Id.* at 1320.  The Ninth Circuit reformulated this language in *Cook v. Ryan*, 688 F.3d 598,

21  607 (9th Cir. 2012).  According to *Cook*, a petitioner may establish cause for a procedural

22  default "by demonstrating two things: (1) 'counsel in the initial-review collateral

23  proceeding, where the claim should have been raised, was ineffective under the standards

24  of *Strickland* . . .' and (2) 'the underlying ineffective-assistance-of-trial-counsel claim is a

25  substantial one, which is to say that the prisoner must demonstrate that the claim has

26  some merit.'" *Id.*

27

28

The Court previously addressed the procedural status of Claims 11, 14, 15, 17, 26, and 27 and concluded those claims should proceed to a merits decision.  (Doc. 275).  But during early briefing on the procedural status of Claims 1-B, 1-D, and 12, Respondents argued those claims were "procedurally barred from federal review."  (Doc. 48 at 47, 52.)  The Court agreed and found Claims 1-B, 1-D, and 12 procedurally defaulted.  But that decision was before *Martinez*, meaning the Court must now reevaluate the status of those claims.

According to Apelt, the default of Claims 1-B, 1-D, and 12 is excused under *Martinez* by Villareal's ineffective performance as PCR counsel.   (Doc. 326.)  Respondents' contrary position is slightly confusing.   It is undisputed Respondents previously argued these claims were procedurally defaulted.  But Respondents now point out the state court made an alternative merits ruling on claims 1-B and 12.[5]  (Doc. 335 at 8.)  Based on that alternative merits ruling, Respondents argue Claims 1-B and 12 "fall outside *Martinez*'s limited reach."   (Doc. 335 at 8.)   As best as can be determined, Respondents' position is as follows.  Claims 1-B and 12 were procedurally defaulted and should be barred from federal review.  But if this Court were to find *Martinez* applicable such that the procedural default might be excused, the Court would have to consider the state court's alternative merits ruling.  This issue matters because the standard of review

---

[5] Respondents argue "Claim 1-D was never presented in state court."  (Doc. 335 at 16 n.6).  Thus, the state court's alternative merits ruling could not have resolved the claim.

differs when evaluating a state court ruling on the merits versus a claim never addressed by a state court.

Normally, procedural default occurs when a claim is not raised in state court. Thus, a federal court using *Martinez* to excuse a procedural default usually results in the court examining the claim *de novo*.  But in this case, the state court found Claims 1-B and 12 procedurally defaulted *and* rejected them on their merits.  In these circumstances, Respondents are correct that excusing the procedural default simply means the Court must consider the merits ruling.

The Ninth Circuit recently addressed a situation very similar to that presented here.  In *Clabourne v. Ryan*, 745 F.3d 362 (9th Cir. 2014), a state petition for post-conviction relief included a claim for ineffective assistance of counsel based on counsel's conduct at sentencing.  The state court rejected that claim.  In doing so, the state court held the claims procedurally improper and without merit.  *Id.* at 383.  The Ninth Circuit held that even assuming *Martinez* could excuse the procedural issue, the alternative merits ruling must still receive the normal deference applicable to state court rulings.  *Id.* ("AEDPA deference applies to this alternative holding on the merits.").

Given the holding in *Clabourne*, the fact that the state court found Claims 1-B and 12 procedurally improper does not mean the Court can ignore the alternative merits ruling.  Instead, the Court must accept that the two claims were resolved by the state court on their merits and review their rejection under the deferential standard applicable to Apelt's other claims.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## II. General Standard for Obtaining Relief

Almost all of Apelt's claims are governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA").  Pursuant to 28 U.S.C. § 2254(d), a petitioner is not entitled to habeas relief on any claim unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The Supreme Court has emphasized that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law."  *Williams v. Taylor*, 529 U.S. 362, 410 (2000).  Thus, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  *Id.* at 411.  Rather, the application must be "objectively unreasonable."  *Id.* at 409.  This distinction creates "a substantially higher threshold" for obtaining relief than *de novo* review.  *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).  Thus, AEDPA imposes a "highly deferential standard for evaluating state-court rulings," *Lindh v. Murphy*, 521 U.S. 320, 333, n.7 (1997), and "demands that state-court decisions be given the benefit of the doubt."  *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  *Harrington v. Richter*, 562 U.S. 86, 101 (2011).  And even "[w]here a state court's

1
2
3
4

decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Id.* at 784.

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20

"[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011) (holding that "the record under review is limited to the record in existence at that same time, *i.e.,* the record before the state court."); *see Murray v. Schriro*, 745 F.3d 984, 998 (9th Cir. 2014) ("Along with the significant deference AEDPA requires us to afford state courts' decisions, AEDPA also restricts the scope of the evidence that we can rely on in the normal course of discharging our responsibilities under § 2254(d)(1)."). Evidentiary development becomes available only if § 2254(d)(1) is satisfied. *See Pinholster*, 131 S. Ct. at 1411; *Sully v. Ayers*, 725 F.3d 1057, 1075–76 (9th Cir. 2013); *Henry v. Ryan*, 720 F.3d 1073, 1093 n.15 (9th Cir. 2013). That is, the record can be expanded only once a petitioner shows there was no reasonable basis for the state court to have denied relief.

## III. Claim 12

21
22
23
24
25
26
27
28

In Claim 12, Apelt alleges Villareal performed ineffectively at sentencing by failing to investigate and present mitigating evidence. Apelt asserts Villareal was obligated to conduct a "thorough, multi-generational social history." (Doc. 326 at 43.) According to Apelt, Villareal's failure or inability to do so led to the omission of "classic mitigating evidence" about Apelt's background and mental health. (*Id.*) As described

above, the second PCR court's alternative ruling denying Claim 12 was a decision on the merits.   Accordingly, this Court must determine whether there is any reasonable argument that Villareal's performance at sentencing met the well-established constitutional minimum for effective assistance of counsel.   In short, there is no such reasonable argument.

### A.  Standard for Claim of Ineffective Assistance of Counsel

As a claim of ineffective assistance of counsel, Claim 12 is governed by the principles set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  To prevail under *Strickland*, Apelt must show Villareal "provided deficient assistance and that there was prejudice as a result."  *Richter*, 562 U.S. at 104.  "Deficient assistance" requires a showing that Villareal's "representation fell below an objective standard of reasonableness."  *Strickland*, 466 U.S. at 688.  And "prejudice" requires establishing "a reasonable probability that, but for [Villareal's] unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.

The inquiry under *Strickland* is meant to be highly deferential and "every effort [must] be made to eliminate the distorting effects of hindsight."  *Id.* at 689.   Under AEDPA, *Strickland* must be applied in a "doubly deferential" way.   *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).  That is, "the question is not whether [Villareal's] actions were reasonable.  The question is whether there is any reasonable argument that [Villareal] satisfied *Strickland*'s deferential standard."  *Richter*, 562 U.S. 86 at 105.  As explained above, the Court must answer this question using only the evidence presented

to the state court.[6]  Therefore, the evidence generated during these federal proceedings will not be considered.[7]

### B. Villareal's Performance was Deficient

In general, counsel in a capital case has an "obligation to conduct a thorough investigation of the defendant's background."[8] *Williams*, 529 U.S. at 396.  While the exact contours of that obligation may vary, "[c]ertain forms of investigation are fundamental to preparing for virtually every capital sentencing proceeding.  At the very least, counsel should obtain readily available documentary evidence such as school, employment, and medical records, and obtain information about the defendant's character

---

[6] The exact evidence the Court may consider is complicated in one respect.  When conducting its analysis, this Court must review the "last reasoned state court opinion." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).  And when the state's highest court denies the claim summarily, the federal court looks through to the last reasoned decision.  *See Johnson v. Williams*, 133 S. Ct. 1088, 1094 n.1 (2013).  The last reasoned decision here is that of the second PCR court, meaning one would expect the record to be limited to that available to the second PCR court.  The Ninth Circuit recently suggested, however, that when looking through to the last reasoned state court decision, a court may review evidence not presented to the court that made that decision.  *Cannedy v. Adams*, 706 F.3d 1148, 1159 & n.5 (9th Cir. 2013).  In *Cannedy*, the "last reasoned state court opinion" was from the California Court of Appeals but the petitioner had submitted new evidence when seeking review by the California Supreme Court.  The Ninth Circuit held it was proper to examine the evidence submitted to the California Supreme Court.  *Id.*  The Court will do the same here and consider the evidence presented to the trial court as well as the Arizona Supreme Court.  But the evidence presented only to the Arizona Supreme Court is of little weight.  Therefore, the result would be the same even if the Court were to ignore that evidence.

[7] The evidence offered by habeas counsel presents a substantially more detailed account of the alleged physical and sexual abuse Apelt and his family suffered at the hands of his father; evidence that Apelt suffered from developmental delays, intellectual deficits, and mental health problems; and records showing he was discharged from the army for "mental inadequacy." (*See* Doc. 326, Ex's 1, 4, 9, 11, 17, 26.)

[8] The Court is aware that determining whether the state court reasonably applied federal law requires examination of the law at the time the state court made its decision. *Greene v. Fisher*, 132 S. Ct. 38, 44 (2011).  But as recently recognized by the Ninth Circuit, later developments in the law can "provide[] direction for determining . . . what constitutes an unreasonable application of Strickland."  *Andrews v. Davis*, No. 09-99012, 2015 WL 4636957, at *16 (9th Cir. Aug. 5, 2015).

1
2
3
4
5
6
7
8
9
10
11
12

and background." *Robinson v. Schriro*, 595 F.3d 1086, 1108-09 (9th Cir. 2010) (citations omitted).    A mitigation investigation should also "include inquiries into social background and evidence of family abuse," *Summerlin v. Schriro*, 427 F.3d 623, 630 (9th Cir. 2005), as well as "evidence of mental impairment" such as that found in "mental health records." *Lambright v. Schriro*, 490 F.3d 1103, 1117 (9th Cir. 2007) (quotations omitted).  "Although counsel will typically begin the investigation by interviewing the defendant, the investigation cannot end there unless the 'defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful.'"  *Robinson*, 595 F.3d at 1109 (quoting *Strickland*, 466 U.S. at 691).

13
14
15
16
17
18
19
20
21
22
23

Villareal clearly did not meet these responsibilities.   Based on the state court record, Villareal did not collect records from social service agencies, welfare agencies, doctors, hospitals, or employers.[9]   Villareal did not interview potential mitigation witnesses, including Apelt's family members, or consult with any mental health experts. Villareal did not obtain Apelt's readily-available mental health records from the Pinal County jail which described Apelt receiving various medications as well as Apelt's placement on suicide watch.   And Villareal did not present a single witness at the sentencing hearing.  This was deficient performance.[10]

24
25
26
27

[9] Villareal did supply the trial court with one letter from a doctor and one letter from an employer.  Those documents, however, had very minimal value.  The letter from the doctor stated only that Apelt had been treated for unnamed illnesses.  The letter from the employer indicated Apelt was an "unobjectionable" employee.  It is unclear why these documents were submitted.

28

[10] Courts have consistently found deficient performance in cases where defense counsel failed to obtain records, interview witnesses, or otherwise perform an adequate

1

2
In reaching the conclusion that Villareal's performance was deficient, the Court

3
has taken into account Villareal's statement that Apelt did not actively participate in the

4
sentencing phase of trial.  It is clear, however, that when certain avenues of investigation

5

6
are foreclosed, counsel must seek "alternative sources of information and evidence."

7
*Hamilton v. Ayer*s, 583 F.3d 1100, 1118 (9th Cir. 2009) (quoting *Silva v. Woodford*, 279

8
F.3d 825, 847 (9th Cir. 2002)).   Assuming Villareal attempted but failed to obtain

9

10
mitigating information from Apelt, Apelt's "lack of cooperation [did] not eliminate

11
[Villareal's] duty to investigate."   *Id.*   That is, Villareal could not "rely solely on

12
information provided by [Apelt] and his family in determining the extent of a proper

13
mitigation investigation."   *Black v. Bell*, 664 F.3d 81, 104 (6th Cir. 2011) (citing

14

15
*Rompilla v. Beard*, 545 U.S. 374, 388–89 (2005)).   Rather, any noncooperation by Apelt

16
simply meant Villareal still had a duty to conduct an independent investigation.[11]

17

18
investigation at sentencing. *See, e.g.*, *Porter v. McCollum*, 558 U.S. 30, 39-40 (finding deficient performance where counsel "had only one short meeting with [the defendant]

19
regarding the penalty phase" and "did not . . . interview any members of [the defendant's]

20
family" or obtain school records); *Summerlin*, 427 F.3d at 631 (finding deficient performance where counsel "conducted no investigation of [the defendant's] family and social history" and "did not speak with [the defendant's] family or friends"); *Robinson*,

21
595 F.3d at 1109-10 (finding deficient performance where counsel "conducted no investigation of Robinson's family history; he did not speak with any member of

22
Robinson's family; he did not request school, medical, or employment records; and he did not request a mental health evaluation"); *Hamilton*, 583 F.3d at 1115 ("Counsel acted

23
deficiently in failing to pursue . . . classic mitigating evidence."); *Lambright*, 490 F.3d at 1121 (finding that counsel's "limited, cursory, and incomplete presentation of mitigating

24
evidence . . . falls far below that which any reasonably competent attorney would provide in a capital case"); *Smith v. Stewart*, 140 F.3d 1263, 1269 (9th Cir. 1998) (finding

25
deficient performance where counsel "engaged in virtually no investigation and presented very little argument at the sentencing phase of the trial").

26
[11] The present case can be compared to another capital trial that occurred around

27
the same time as Apelt's trial.  The other case also involved a seemingly non-cooperative defendant and an alleged failure to investigate and present mitigating evidence.

28
*Landrigan v. Schriro*, 441 F.3d 638 (9th Cir. 2006), *rev'd* 550 U.S. 465 (2007).  In that case, counsel's investigation included obtaining "several medical documents indicating

No doubt conducting an adequate mitigation investigation was hampered by Villareal's need to obtain funding to travel to Germany. But Villareal's performance nevertheless was legally deficient. Villareal failed to provide additional information to the trial court, as invited by the court, which perhaps would have persuaded the court to authorize funding for travel to Germany. There is nothing in the record explaining why Villareal decided not to press the court with the details supporting an investigation in Germany. It is telling that PCR counsel obtained voluminous material regarding mitigation without traveling to Germany. Again, the record does not explain why Villareal was unable to obtain the same information with or without a trip to Germany.[12]

Respondents disagree and argue Villareal's conduct might be explained as a strategic decision to focus on good character evidence rather than evidence of Apelt's mental illness. (Doc. 335 at 41.) This argument ignores that Villareal intended to seek information about Apelt's mental health, including his hospitalization in Germany. (RT

---

[the defendant had] a long history of substance abuse." *Id.* at 643. Counsel also arranged for a psychological examination of the defendant and spoke with two of the defendant's family members. The Ninth Circuit described that investigation as "rather asthenic" that "might well" be "prejudicially asthenic" in some circumstances. *Landrigan v. Stewart*, 272 F.3d 1221, 1227 (9th Cir. 2001). But relief in that case was denied because the defendant stated, on the record, that he did not wish to present mitigating evidence. The "rather asthenic" investigation conducted in that case is more than what was performed in this case and there is no indication Apelt instructed Villareal not to present mitigating evidence.

[12] Under the Ethical Rules governing Arizona attorneys at the time, Villareal had an ethical obligation to either provide competent representation or move to withdraw. State Bar of Arizona Ethics Opinion 86-04 (stating ER 1.16 required attorney to "withdraw from the representation of a client if . . . the representation [would] result in violation of the Rules of Professional Conduct" and providing "competent representation" was required by ER 1.1). If the court's refusal to provide adequate funding rendered Villareal unable to provide competent representation, Villareal had an ethical obligation to seek to withdraw. This presupposes that Villareal would have pursued with the court all persuasive means of obtaining funding.

6/11/90 at 8; RT 8/7/90 at 5.)   Thus, Apelt's mental health was not an issue Villareal strategically neglected.   Rather, he knew it was material evidence and, inexplicably, failed to pursue it.  *See Wiggins*, 539 U.S. at 527 (finding deficient performance where "known evidence would lead a reasonable attorney to investigate further").

Respondents' argument also ignores that Villareal failed to present evidence of Apelt's childhood poverty and abuse—humanizing information that would have been within the parameters of good character evidence.   Moreover, Villareal himself admitted there was no strategic basis for his failure to investigate or present more relevant mitigating evidence.

In sum, Villareal "did not perform any real investigation into mitigating circumstances, and gave no tactical reasons for his failure to do so."  *Robinson*, 595 F.3d at 1109 (quotation omitted).   The deficits of the mitigation investigation were neither strategic nor tactical and Villareal did not seek alternative means of investigation when the court denied his requests for funds to travel to Germany.   No fairminded jurist could conclude Villareal's performance was sufficient.

**C.  Apelt was Prejudiced by Villareal's Deficient Performance**

Having established Villareal's performance was deficient, Apelt must establish he was prejudiced as a result.   Under *Strickland*, Villareal's performance was prejudicial if there is a reasonable probability that the result of the proceeding would have been different absent Villareal's deficient performance.   *Strickland*, 466 U.S. at 694.   A "reasonable probability" is "less than the preponderance more-likely-than-not standard."

1
2        *Summerlin*, 427 F.3d at 643.   Rather, it is "a probability sufficient to undermine

3    confidence in the outcome."   *Strickland*, 466 U.S. at 694.   In the specific context of

4    capital sentencing, "it is not necessary for the habeas petitioner to demonstrate that the

5
6    newly presented mitigation evidence would necessarily overcome the aggravating

7    circumstances."   *Correll v. Ryan*, 539 F.3d 938, 951-52 (9th Cir. 2008).   Instead, the

8    focus should be on "the magnitude of the discrepancy between what counsel did

9
10   investigate and present and what counsel could have investigated and presented."   *Hovey*

11   *v. Ayers*, 458 F.3d 892, 929 (9th Cir. 2006) (quotation omitted).

12            Given Villareal's weak presentation at sentencing, the prejudice inquiry is

13   straightforward.   Villareal's case in mitigation contained no evidence of Apelt's alleged

14
15   poverty, no evidence of childhood physical abuse, no evidence of repeated childhood

16   sexual abuse, and no meaningful evidence of mental health problems.   The only

17   information available to the sentencing court regarding Apelt's childhood seemed to

18   show Apelt had no problems during his childhood.   (ROA 308 at 8.)   In fact, the

19
20   prosecutor stressed Apelt's alleged "normal childhood" and Villareal also submitted a

21   statement from Apelt's mother stating Apelt had a normal childhood.[13]   (Doc. 326-2 at

22   34.)   In short, the sentencing court was presented with a picture of Apelt's background

23   that bore "no relation" to the picture presented by PCR counsel with apparently reliable

24
25   evidence.   *Rompilla*, 545 U.S. at 392-93.   The magnitude of the difference between the

26

27            [13] At sentencing, Apelt's mother stated in a letter Apelt had a "normal childhood."
28   But during the PCR proceedings, she stated Apelt's childhood contained numerous
     traumatic events.   The present record contains no way of resolving this inconsistency.

mitigating evidence that was presented at sentencing and the evidence that could have been presented through a competent investigation is sufficient to undermine confidence in the outcome.  No fairminded jurist could conclude otherwise.

### D.   Evidentiary Development

Apelt has established the PCR court's denial of Claim 12 was an unreasonable application of *Strickland* under 28 U.S.C. § 2254(d)(1).  Apelt seeks development of the claim, including expansion of the record and an evidentiary hearing.  (Doc. 326 at 53–55.)  At the evidentiary hearing, Apelt plans to present testimony from Villareal, a mental health expert, social history witnesses, and Apelt's family members.  (*Id.* at 54–55.) Because § 2254(d)(1) does not preclude relief on Claim 12, *Pinholster* does not prohibit evidentiary development in this Court. *Pinholster*, 131 S. Ct. at 1400-01 ("Section 2254(e)(2) continues to have force where § 2254(d)(1) does not bar federal habeas relief"); *see Henry*, 720 F.3d at 1093 n.15 (explaining that *Pinholster* bars evidentiary hearing unless Apelt satisfies § 2254(d)).  As the Eleventh Circuit recently explained:

> Nothing in *Pinholster*, or any other principle of habeas corpus, bars a District Court from conducting an evidentiary hearing where, as here: (1) the federal claim was adjudicated on the merits in state court; (2) there is a determination based only on the state court record that the petitioner has cleared the § 2254(d) hurdle; and (3) the habeas petitioner tried, but was not given the opportunity to develop the factual bases of the claim in state court within the meaning of 28 U.S.C. § 2254(e)(2).

*Madison v. Commissioner, Alabama Dept. of Corrections*, 761 F.3d 1240, 1249-50 (11th Cir. 2014) (footnote omitted).  The Ninth Circuit has not provided clear guidance on whether an evidentiary hearing is required in cases such as this.  *See, e.g.*, *Bemore v.*

*Chappell*, No. 12-99005, 2015 WL 3559153 (9th Cir. June 9, 2015) (granting relief without remanding for evidentiary hearing).

Having determined the denial of Apelt's IAC claims was objectively unreasonable, it is unclear whether an evidentiary hearing is required or advisable when deciding whether to grant relief. It is undisputed Villareal presented only a modicum of information and failed to investigate what appears to be substantial mitigating evidence PCR counsel later discovered and presented. Holding an evidentiary hearing would seemingly allow Apelt simply to present *more* evidence establishing Villareal's performance was defective. Perhaps an evidentiary hearing is appropriate to allow Respondents to challenge the veracity of Apelt's evidence. But Respondents have not so requested a hearing. Accordingly, the Court will order briefing on whether an evidentiary hearing should be held and, if so, the proposed scope of that hearing.

## IV.   Claims 1-B, 1-D, 11, 14, 15, 17, 26, and 27

Apelt has a variety of other claims, none of which entitle him to relief. Because resolution of these claims will be relevant should ultimate relief not be afforded on Claim 12, the Court will address them.

### A.   Claims 1-B and 1-D

In Claim 1-B, Apelt contends he was "severely mentally ill and grossly over-medicated" at the time of trial, and that Villareal was ineffective for failing to challenge his competency to stand trial. (*See* Doc. 326 at 16.) In Claim 1-D, Apelt makes the same

allegations with respect to his competence at sentencing.[14]  (*Id.*)  Apelt is not entitled to relief on these claims.

"Competence to stand trial requires that a defendant have (1) 'a rational as well as factual understanding of the proceedings against him,' and (2) 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding.'" *Stanley v. Cullen*, 633 F.3d 852, 860 (9th Cir. 2011) (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam)).  "A claim that counsel was deficient for failing to move for a competency hearing will succeed only when there are sufficient indicia of incompetence to give objectively reasonable counsel reason to doubt defendant's competency, and there is a reasonable probability that the defendant would have been found incompetent to stand trial had the issue been raised and fully considered." *Hibbler v. Benedetti*, 693 F.3d 1140, 1149-50 (9th Cir. 2012) (quotations omitted).

Respondents contend Villareal made a reasoned decision not to challenge Apelt's competency and that the record contains no support for the proposition that Apelt was not competent to stand trial.  (Doc. 335 at 20.)  The Court agrees.

Villareal did not neglect to consider the issue of Apelt's competency.  Prior to trial, co-counsel traveled to Germany, in part to investigate Apelt's placement in a psychological institution there.  Counsel did not find evidence to support the filing of a

---

[14] Because, as Apelt concedes, the claims "share the same factual nexus" (Doc. 326 at 16 n.6), the Court considers them together.  The standard of review applicable to the two claims is different in that Claim 1-D was not addressed by the state court while Claim 1-B was addressed by the alternative ruling.  Accordingly, AEDPA deference applies to Claim 1-B but not Claim 1-D.  In the end, however, it does not matter as both claims fail regardless of the applicable standard.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

motion to determine competency.  (RT 6/11/90 at 7.)  More significantly, the record does not support a finding that Apelt lacked a rational and factual understanding of the proceedings or the ability to consult with counsel with a reasonable degree of rational understanding.[15]

Apelt was actively involved in his defense.  He filed a *pro per* motion to change counsel.  (ROA 237.)  He complained Villareal failed to communicate adequately with him by phone or in writing; "refused to investigate specific details . . . that would exonerate [him]," including "autopsy reports, photos, initial police reports stating defendant is not suspected"; and failed to "forward requested materials from the legal library."  (*Id.*)  Apelt also authored jailhouse notes to his brother which indicated Apelt was keenly aware of the factual details of his case, including the evidence against him, and was rationally communicating with counsel about his defense. (RT 5/8/90 at 61–63.)

The record further shows Apelt was actively involved in the trial proceedings.  For example, Apelt notified Villareal that certain jurors had observed him being escorted from the courtroom wearing shackles.  (RT 4/26/90 (legal argument) at 3-4.)  When Villareal recounted the incident to the judge, Apelt corrected Villareal's description of the jurors' location.  (*Id.* at 3.)  He drew a diagram of the jury box to help Villareal and

---

[15] In rejecting Apelt's claim that appellate counsel's ineffectiveness constituted cause to excuse the default of a claim alleging that the trial court committed constitutional error by failing to conduct a competency hearing, this Court determined that "the trial and sentencing record in this case would not alert a reasonable appellate attorney to the feasibility of a procedural incompetency claim." (Doc. 132 at 16.)

the court identify the jurors who had seen him. (*Id.*) He also told Villareal that the incident jeopardized his right to a fair trial. (*Id.*)

In addition, Apelt's trial testimony gave no cause for Villareal to doubt his competence. Apelt recounted the travels that led him, Rudi, and Dorn to Mexico, San Diego, and finally Phoenix. (RT 5/8/90 at 141–51.) He also testified at length and in detail, recounting the events that led to his marriage and denying he had murdered Cindy. (RT 5/8/90 at 140–77; RT 5/9/90 at 4–141.) Apelt even explained the purchase of the life insurance policy as an investment for their children. (*Id.* at 156–57.) "That a defendant is alert, unafraid to address the court, and able to use somewhat technical legal terms appropriately is a factor suggesting that a competency hearing is not required." *Stanley*, 633 F.3d at 861 (quotations omitted); *see Turrentine v. Mullin*, 390 F.3d 1181, 1209 (10th Cir. 2004) (recognizing that "evidence of a petitioner's lucid and intelligible testimony at trial refutes [a] claim of trial counsel's failure to argue competency").

To counter the idea that he was aware of the accusations against him and was competent to assist counsel, Apelt relies on records indicating that at the time of his trial he had been prescribed a number of medications, including Valium, Thorazine, Halcion, Ativan, Parafon Forte, and Sinequan. (Doc. 326 at 18–19; *id.*, Ex. 36.) Prior to sentencing, the medical director of inmate health services at the Pinal County Jail determined that Apelt was "overmedicated" and removed some of the medications, but left in place the Halcion, Valium and Parafon Forte prescriptions. (Doc. 326, Ex. 36.)

1
2
3
4
5
6
7
8
9
10
11

 In addition, Apelt has submitted a letter, dated January 16, 2004, from Dr. Edward Fisher, a pharmacology and toxicology expert who reviewed Apelt's medical records. (*Id.*, Ex. 38.)  Dr. Fisher wrote that the medications Apelt was prescribed are powerful drugs "generally considered to possess significant central nervous system (CNS) depressant effects."  (*Id.*)  According to Dr. Fisher, when the drugs are prescribed in combination, "the risk of adverse effects increases significantly."  (*Id.*)  Such "adverse effects" include "oversedation, confusion, loss of self-control, impaired judgment, and anterograde amnesia."  (*Id.*)

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

 Apelt asserts "the drugs [and] doses administered to him, likely interfered with his ability to consult with his lawyer and understand the proceedings."  (Doc. 326 at 19.)  Apelt does not, however, cite any evidence that the drugs did in fact affect his competence.  In *United States v. Shan Wei Yu*, 484 F.3d 979, 985 (8th Cir. 2008), the Eighth Circuit found the defendant's consumption of Prozac, Seroquel, Ativan, and sleeping pills did not require the trial court to conduct a competency hearing absent evidence of incompetency.  The court noted that "[n]o party suggested at trial . . . that Yu was incompetent or unable to understand the proceedings, and Yu testified coherently as to the nature of his defense."  *Id.*  The court also found "Yu's complaints about his attorneys . . . evidence that Yu understood the case against him and was capable of consulting with counsel."  *Id.*  As in *Yu*, the record here shows Apelt was aware of the factual details of his case, communicated rationally with Villareal, and participated actively in his defense.

Apelt also cites the fact that he had been placed on suicide watch while awaiting trial and had been admitted to the custody of the correctional health services on another occasion.  (Doc. 326 at 18.)  The fact that Apelt had a history of mental health problems was not in itself sufficient to show he was incompetent to stand trial.  *See Hoffman v. Arave*, 455 F.3d 926, 938 (9th Cir. 2006) ("We have held that those with mental deficiencies are not necessarily incompetent to stand trial."), *vacated on other grounds by Arave v. Hoffman*, 552 U.S. 117, 117-19 (2008) (per curiam)).  And Apelt has failed to identify an instance in which he behaved irrationally, appeared not to understand the proceedings, or did not communicate effectively with Villarreal.

In sum, Apelt has not met his burden of showing Villareal performed ineffectively under *Strickland* by failing to seek a competency hearing.  There were not sufficient indicia of incompetence to give Villareal reason to doubt Apelt's competency, and there was not a reasonable probability that Apelt would have been found incompetent if the issue been raised and considered.  Claims 1-B and 1-D are denied.

**B.  Claim 11**

Apelt's Claim 11 alleges the trial court denied him "the tools of an adequate defense in violation of his rights under the Eighth and Fourteenth Amendments to the United State Constitution" when it denied counsel Villareal's request to travel to Germany to investigate mitigating evidence.  (Doc. 285 at 11–18.)  The state court's decision was not unreasonable.

On direct appeal, the Arizona Supreme Court rejected Apelt's argument that the trial court erred in denying his request for money to travel to Germany. The court noted "[a] defendant has a due process right to such assistance upon a . . . showing of necessity." *State v. Apelt*, 861 P.2d 634, 650 (Ariz. 1993). In denying relief on this claim, the Arizona Supreme Court cited *Caldwell v. Mississippi*, 472 U.S. 320, 323 n.1 (1985), which held there was "no deprivation of due process in the trial judge's decision" to deny the appointment of defense experts where a defendant "offered little more than undeveloped assertions that the requested assistance would be beneficial." The Arizona Supreme Court's application of *Caldwell* was not unreasonable.

In his motion for additional funding and in his arguments to the court, Villareal offered only generalized assertions that further investigation in Germany would be beneficial. Prior to the aggravation/mitigation hearing, the only specific areas of potential mitigating evidence counsel mentioned were a psychological hospitalization and a difficult birth. (RT 6/11/90 at 7–8.) The court provided Villareal an opportunity to supplement his request, but he failed to provide the additional information. (*Id.* at 10; ROA 302.) Villareal again failed to offer any specific information when he renewed his funding request and moved for a continuance prior to the aggravation/mitigation hearing. (ROA 307.) At the hearing, Villareal listed the types of records and witnesses that should be reviewed in a mitigation case but again failed to provide *specific* information in support of his request for funding. (RT 8/7/90 at 5.)

Villareal's submissions to the trial court did not make the "threshold showing" that

additional funds "would be helpful." *Williams v. Stewart*, 441 F.3d 1030, 1054 (9th Cir. 2006). In a case presenting analogous facts, the Ninth Circuit held a trial court did not commit constitutional error when it denied funding for an investigator to travel to West Virginia in search of mitigating information. *Id.* The court noted "[t]he only information [the petitioner] submitted to the trial court regarding this request was a list of many people who lived in the area of West Virginia where [he] was raised." *Id.* The petitioner had not proffered "any information other than possible witness names and that they would be helpful." *Id.*

The information provided by Villareal was similarly undeveloped. Beyond the fact that Apelt was born and raised in Germany, Villareal failed to support his argument that it was necessary for him to travel to Germany to gather mitigating evidence; nor did he file the statement of necessity required by the trial court. Because Villareal offered only "undeveloped assertions" in support of his request for funds to travel to Germany, the Arizona Supreme Court did not unreasonably apply *Caldwell* in denying this claim. Apelt is not entitled to relief on Claim 11.

### C. Claim 14

Apelt's Claim 14 alleges the state courts violated his rights under the Eighth and Fourteenth Amendments by finding he procured the commission of the murder under A.R.S. § 13-703(F)(4). The Court disagrees.

Section 13-403(F)(4) establishes an aggravating factor where the defendant "procured the commission of the offense by payment, or promise of payment, of anything

of pecuniary value."  The factor applies "not only to hired killer situations, but also to those cases in which the murder was committed with a 'financial motivation.'"  *State v. Adamson*, 665 P.2d 972 (Ariz. 1983).

The trial court found the factor had been proven: "The defendant conspired with another to assist in the commission of the offense with the expectation and promise to the other to share in the receipt of the insurance proceeds on the life of the victim in the sum of $400,000."  (RT 8/13/90 at 7.)  The Arizona Supreme Court affirmed the trial court's finding:

> We agree that the evidence showed beyond a reasonable doubt that [Apelt] killed Cindy in order to receive the $400,000 insurance proceeds (§ 13–703(F)(5)). No further discussion is necessary.

> We also agree that the evidence establishes beyond a reasonable doubt that [Apelt] procured Rudi's assistance in the murder by promising him a share of the insurance proceeds, thus satisfying the § 13-703(F)(4) factor.

*Apelt*, 861 P.2d at 652.

On habeas review of a state court's finding of an aggravating factor, a federal court is limited to determining "whether the state court's [application of state law] was so arbitrary and capricious as to constitute an independent due process or Eighth Amendment violation."  *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990).  In making that determination, the reviewing court must inquire "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the factor had been satisfied."  *Id.* at 781 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

In addition, under section 28 U.S.C. § 2254(d) federal courts "must apply the standards of *Jackson* with an additional layer of deference." *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005); *see Coleman v. Johnson*, 132 S. Ct. 2060, 2062 (2012) (per curiam) (noting *Jackson* claims are "subject to two layers of judicial deference"); *Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011) (per curiam).  Therefore, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court.  The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Johnson*, 132 S. Ct. at 20162 (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010)).

Although Apelt asserts "there is no evidence that [he] promised Rudi anything in exchange for Rudi's role in the murder" (Doc. 285 at 19), the gravamen of his argument is that Dorn's testimony was inconsistent, unreliable, and not sufficient to support a finding that Apelt procured his brother's assistance in the murder.  This argument is unpersuasive.

Dorn testified that on the day before the murder Apelt brought Cindy's life insurance paperwork to the motel where Dorn and Rudi were staying and told them "we can have a lot of money, and we don't have to worry anymore . . . if he would go out and kill Cindy."  (RT 5/2/90 at 51.)  Apelt contends that this is inconsistent with testimony in which Dorn stated Apelt said "he" would be rich if Cindy died.  (*See id.* at 49.)  The fact that Apelt used the singular pronoun on an earlier occasion is not inconsistent with a

finding that he intended to share the insurance proceeds with Rudi in exchange for Rudi's participation in the murder.

Apelt challenges Dorn's credibility because she was a coconspirator who testified against the brothers under a grant of immunity.  On habeas review, however, this Court is not permitted to re-assess Dorn's credibility.  *See Rice v. Collins*, 546 U.S. 333, 341-42 (2006) ("Reasonable minds reviewing the record might disagree about . . . credibility, but on habeas review, that does not suffice to supersede the trial court's credibility determination.").  In addition, all evidence must be considered in the light most favorable to the prosecution, *Jeffers*, 497 U.S. at 782, and if the facts support conflicting inferences, such as Dorn's putatively inconsistent testimony, a reviewing court "must presume— even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326.

Applying the levels of deference required under *Jackson* and AEDPA, the Court finds Apelt is not entitled to relief.  A rational trier of fact could have concluded, as the trial court did, that the factor was proven, and the decision of the Arizona Supreme Court affirming that finding was not objectively unreasonable.  Claim 14 is denied.[16]

---

[16]  In his merits brief Apelt raised for the first time an argument that his constitutional rights were violated because the (F)(4) and F(5) factors were "double-counted" in aggravation.  (*See* Doc. 285 at 21.)  Apelt did not pursue this argument in his reply brief.  (*See* Doc. 301 at 13-18.)  Even if Apelt has properly raised such a claim, the holding in *State v. Carlson*, 48 P.3d 1180 (Ariz. 2002), does not, as he contends, entitle him to habeas relief.  In *Carlson*, the Arizona Supreme Court held that "[e]ven if there is but one transaction leading to the murder, a judge can properly use a single fact to

1
2

### D.  Claim 15

3

Apelt's Claim 15 alleges the state courts violated his rights under the Eighth and

4

Fourteenth Amendments by finding the murder was committed in an especially cruel,

5

heinous, or depraved manner under A.R.S. § 13-703(F)(6).  Apelt is incorrect.

6
7

The (F)(6) aggravating factor, phrased in the disjunctive, is satisfied if the murder

8

is either especially heinous, or cruel, or depraved.  *See, e.g.*, *State v. Murray*, 906 P.2d

9

542, 570 (Ariz. 1995).  The especially cruel prong is satisfied "if the victim consciously

10

experienced physical or mental pain and suffering prior to dying."  *State v. Lopez*, 847

11

P.2d 1078, 1090 (Ariz. 1992).  Evidence about "[a] victim's certainty or uncertainty as to

12

his or her ultimate fate can be indicative of cruelty and heinousness."  *State v. Gillies*,

13

691 P.2d 655, 660 (Ariz. 1984).  Factors supporting a finding that a murder was heinous

14

and depraved include the infliction of gratuitous violence and the helplessness of the

15
16

victim.  *See Gretzler*, 659 P.2d at 11.

17

The trial court found the (F)(6) factor was satisfied: "The nature of the wounds

18
19

(fifty-three separate injuries, five stab wounds and a cut of the throat which nearly

20

decapitated the victim, and a shoe print on her face) establish that the killing was

21

especially cruel to the victim or heinous or depraved in its execution."  (RT 8/13/90 at 7.)

22
23
24

---

25

support the application of more than one aggravating factor" so long as he does not give

26

full weight to each factor.  48 P.3d at 1191.  While the court noted that *Apelt* was the "rare" instance where both the (F)(4) and (F)(5) had been applied, the court also

27

explained that it "did not consider the single transaction problem in that case."  *Id.*

28

*Carlson* does not, therefore, support Apelt's argument that double-counting is a grounds for relief.

The Arizona Supreme Court upheld the trial court's finding, noting the circumstances of the murder supported the finding. *Apelt*, 861 P.2d at 652-53.

Apelt contends the Arizona Supreme Court unreasonably applied *Jackson*, and made an unreasonable determination of the facts, in concluding that the (F)(6) factor had been established. (Doc. 285 at 29.) Specifically, he asserts "[t]here was simply no evidence that the victim consciously suffered during her death." (*Id.* at 28.) Apelt is wrong.

The Court's review of this claim is limited to assessing "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the factor had been satisfied." *Jeffers*, 497 U.S. at 781 (quoting *Jackson*, 443 U.S. at 319). Here, a rational fact-finder, viewing the evidence in the light most favorable to the State, could have inferred, as the state courts did, that Cindy was conscious and suffered mental and physical pain before being killed by the Apelts. Evidence suggested Cindy was forcibly removed from the apartment and was bound at some point. Scraped knees and evidence of a defensive wound indicated she was conscious before she suffered her fatal wounds. Apelt contends this evidence, along with evidence of the numerous nonfatal wounds Cindy suffered, does not conclusively prove she was conscious and experienced pain before she died because the coroner's testimony about the nature and timing of the injuries was equivocal. (Doc. 285 at 27–28.) But interpreted in the light most favorable to the prosecution, this evidence was sufficient for a rational fact-finder to conclude Cindy was conscious and suffered mental and physical

pain before she was killed.

The state court's denial of Claim 15 was not objectively unreasonable.[17]   Apelt is not entitled to relief on Claim 15.

### E.  Claim 17

Apelt's claim 17 alleges the trial court failed to properly consider the mitigating factors proffered at sentencing and that the Arizona Supreme Court failed to properly consider and independently reweigh the evidence, in violation of Apelt's rights under the Eighth and Fourteenth Amendments.  Principally, he asserts the Arizona Supreme Court erred by excluding from its consideration certain mitigating evidence in violation of *Tennard v. Dretke*, 542 U.S. 274 (2004).  Apelt is not entitled to relief on this claim.

Once a determination is made that a person is eligible for the death penalty, the sentencer must consider relevant mitigating evidence, allowing for "an individualized determination on the basis of the character of the individual and the circumstances of the crime."  *Tuilaepa v. California*, 512 U.S. 967, 972 (1994).  The Supreme Court has explained that "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background may be less culpable than defendants who have no such excuse."  *Wiggins v. Smith*, 539 U.S. 510, 535 (2003) (quoting *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989)).  Therefore, the sentencer in a capital case is

---

[17] Having determined the state courts reasonably found the cruelty prong had been proven, it is unnecessary for the Court to address the parties' arguments concerning the heinous or depraved prongs.

1
2
required to consider any mitigating information offered by a defendant, including non-

3
statutory mitigation.

4
5
However, while the sentencer must not be foreclosed from considering relevant

6
mitigation, "it is free to assess how much weight to assign such evidence." *Ortiz v.*

7
*Stewart*, 149 F.3d 923, 943 (9th Cir. 1998). There is no set formula for weighing

8
mitigating evidence, and the sentencer may be given "unbridled discretion in determining

9
10
whether the death penalty should be imposed after it has found that the defendant is a

11
member of the class made eligible for that penalty." *Zant v. Stephens*, 462 U.S. 862, 875

12
(1983).

13
Apelt's sentencing did not violate these requirements. At sentencing, the trial

14
15
court found Apelt had failed to establish any statutory mitigating factors. The court then

16
stated it had considered and rejected the nonstatutory mitigating circumstance offered by

17
counsel: "The defendant presented other matters for the court to consider which the court

18
19
has considered which include his remorse, cooperation and good behavior, his new found

20
religious beliefs, his military service, and other matters which appear of record, but none

21
of which are found to be significant mitigating factors; all of which have been

22
23
considered." (RT 8/13/90 at 8–9.) On direct appeal, the Arizona Supreme Court

24
independently reviewed the aggravating and mitigating circumstances, and found Apelt's

25
mitigation insufficiently substantial to warrant leniency. *Apelt*, 861 P.2d at 653-54.

26
Given that the state courts considered all proffered mitigation, there was no constitutional

27
violation.

28

- 42 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

The trial court expressly stated it had "considered" all of Apelt's proffered mitigating factors.  (RT 8/13/90, at 8–9.)  This statement is virtually dispositive of Apelt's claim.  *See Parker v. Dugger*, 498 U.S. 308, 314-15 (1991) ("We must assume that the trial court considered all [mitigating] evidence before passing sentence.  For one thing, he said he did.").  As for the Arizona Supreme Court, its independent review did not exclude Apelt's mitigating evidence from consideration.  Apelt focuses on the court's statement that Apelt "failed to advance any credible argument as to why some factors should be considered mitigating at all." *Apelt*, 861 P.2d at 653-54.  But that statement did not refer to the entirety of Apelt's mitigation evidence but rather to Apelt's argument that certain circumstances—namely his cooperation with the presentence investigation, the plea bargain offered to Rudi, and Dorn's immunity—were in fact mitigating at all.  *Id.* Again, there is no constitutional requirement that the sentencer assign proffered mitigating evidence any particular weight.  *See Harris*, 513 U.S. at 512.

Finally, Apelt asserts the Arizona courts imposed a causal nexus requirement in violation of Supreme Court rulings.  The argument that the courts employed such a test in Apelt's case, however, is unsupported by the record.  The sentencing court expressly stated that it had "considered" all of the proffered mitigation, and the opinion of the Arizona Supreme Court does not discuss a causal connection requirement.

The state courts considered all the mitigating evidence Apelt presented. Therefore, Apelt is not entitled to relief on Claim 17.

- 43 -

1

2

**F.  Claim 26**

3

Apelt's claim 26 contends he is intellectually disabled and therefore, under *Atkins*

4

*v. Virginia*, 536 U.S. 304 (2002), his execution is prohibited by the Eight Amendment.[18]

5

(Doc. 285 at 35.)

6

7

In *Atkins*, the United States Supreme Court held that "death is not a suitable

8

punishment for" an intellectually disabled criminal and the Eighth Amendment prohibits

9

the execution of such persons.  *Atkins*, 536 U.S. at 321.  The Supreme Court explained

10

that "clinical definitions of mental retardation require not only subaverage intellectual

11

functioning, but also significant limitations in adaptive skills such as communication,

12

self-care, and self-direction that became manifest before age 18."  *Id.* at 318.  However,

13

the Supreme Court reserved for the states "the task of developing appropriate ways to

14

15

enforce the constitutional restriction" against executing intellectually disabled persons.

16

*Id.* at 317 (quoting *Ford v. Wainwright*, 477 U.S. 399, 405 (1986)).

17

18

Arizona law defines intellectual disability as "a condition based on a mental deficit

19

that involves significantly subaverage general intellectual functioning, existing

20

concurrently with significant impairment in adaptive behavior, where the onset of the

21

foregoing conditions occurred before the defendant reached the age of eighteen."  A.R.S.

22

§ 13-753(K)(3).  "Significantly subaverage general intellectual functioning" means a full

23

24

scale intelligence quotient of 70 or lower.  A.R.S. § 13-753(K)(5).  The statute directs the

25

26

---

27

[18] The terms "intellectual disability" and "mental retardation" "describe the identical phenomenon." *Hall v. Florida*, 134 S. Ct. 1986, 1990 (2014).  Unless appearing in a quote, the Court uses the former.

28

trial court, in determining IQ, to "take into account the margin of error for the test administered." *Id.*

Arizona law defines "adaptive behavior" as "the effectiveness or degree to which the defendant meets the standards of personal independence and social responsibility expected of the defendant's age and cultural group." A.R.S. § 13–753(K)(1). The statute "requires an overall assessment of the defendant's ability to meet society's expectations of him" and "does not require a finding of [intellectual disability] based solely on proof of specific deficits or deficits in only two areas."[19] *State v. Grell*, 135 P.3d 696, 709 (Ariz. 2006).

Under Arizona law, a defendant bears the burden of proving intellectual disability by clear and convincing evidence. A.R.S. § 13–753(G). A "determination by the trial court that the defendant's intelligence quotient is sixty-five or lower establishes a rebuttable presumption that the defendant has [an intellectual disability]." *Id.* Even if such a presumption is established, however, a defendant retains the burden of persuasion on the issue of intellectual disability. *See State v. Arellano (Apelt)*, 143 P.3d 1015, 1019 (Ariz. 2006).

The state court held an evidentiary hearing on the *Atkins* issue from April 30, 2007, through May 11, 2007, and on September 28, 2007. At the conclusion of the

---

[19] By contrast, the Diagnostic and Statistical Manual-IV (DSM-IV) instructs that poor adaptive skills exist when there are deficits in at least two of the following areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety. *See Grell*, 135 P.3d at 709 n.12.

hearing, the court found that Apelt had not proven he was intellectually disabled. (Doc. 285, Ex. 27.)  Apelt challenges that ruling, arguing the court committed several errors in its interpretation of the evidence with respect to both the subaverage intelligence and adaptive behavior prongs.  (*See* Doc. 285 at 39.)  Respondents contend the state court's ruling was neither contrary to nor an unreasonable application of *Atkins*, and did not involve an unreasonable determination of the facts.  (Doc. 291 at 55.)  The Court agrees.

Under AEDPA, Apelt must show that the state court's decision was contrary to or an unreasonable application of *Atkins*, 28 U.S.C. § 2254(d)(1), or was based on an unreasonable determination of the facts in light of the evidence presented at the evidentiary hearing, § 2254(d)(2).  Under 28 U.S.C. § 2254(e)(1), "a determination of a factual issue made by a State court [is] presumed to be correct," and a petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence."  The parties agree that the question of whether Apelt is intellectually disabled is a factual issue and subject to review under (d)(2).[20]  (*See* Doc. 301 at 31.)

Apelt's arguments consist of disagreements with the state court's analysis of the evidence presented in the *Atkins* proceedings.  He identifies several alleged errors.  With respect to subaverage intelligence, Apelt asserts the court relied on an "unverifiable IQ

---

[20] Respondents argue that the "rational factfinder" standard of review, *see Jackson*, 443 U.S. at 307, should apply to Apelt's *Atkins* claim, so that the state court's ruling that Apelt did not prove intellectual disability must be upheld if any rational trier of fact could have reached the same conclusion.  (Doc. 291 at 58.)  Because the applicability of the rational factfinder standard in the *Atkins* context appears unsettled, *compare United States v. Webster*, 421 F.3d 308, 311 (5th Cir. 2005), *with Hooks v. Workman*, 689 F.3d 1148, 1166 (10th Cir. 2012), the Court will review the state court's findings under 28 U.S.C. § 2254(d)(2) and (e)(1).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

score from Apelt's childhood" and applied an "inappropriate margin of error to IQ scores." (Doc. 285 at 39.) With respect to adaptive behavior, Apelt asserts the court "overemphasized" his post-incarceration behavior and "disregarded and misinterpreted evidence of adaptive behavior deficits." (*Id.*) As discussed below, these alleged errors do not entitle Apelt to habeas relief.

### i. Subaverage intelligence

During the evidentiary hearing, the court heard testimony from Dr. Helmut Kury, a psychologist, and Dr. Ronald Ruff, a neuropsychologist, on behalf of Apelt, and Dr. John Moran, a clinical psychologist, on behalf of the State. Drs. Ruff and Kury performed IQ tests on Apelt. The record also contains an IQ score from a test administered when Apelt was a child. In addition, Dr. Harry Tamm, a neurologist retained by Apelt, reviewed the results of an EEG and an MRI brain scan.

Drs. Ruff and Kury concluded Apelt is intellectually disabled. Specifically, they found that he suffers from "Mild Mental Retardation." (Doc. 285, Ex. 3 at 5.) Dr. Moran concluded Apelt is not intellectually disabled under Arizona law. (Doc. 285, Ex. 5 at 59.) After considering the evidence, the court determined Apelt failed to establish he has significantly subaverage general intellectual functioning under A.R.S. § 13-753(K)(5). (Doc. 285, Ex. 27 at 3–4.) The court explained Apelt had been tested as a child and found to have an "overall IQ" of 88 based on the German children's version of the Hamburg Wechsler Adult Intelligence Scales (HAWIE)." The court also found that Apelt had malingered during more recent exams.

- 47 -

1

2          Apelt criticizes the court's decision to accept the validity of the childhood IQ

3     score of 88 despite the lack of raw testing data and information about the qualifications of

4     those who administered and scored the test, and notwithstanding the skepticism of Drs.

5     Kury and Ruff, who opined that the score was erroneous.   Apelt also challenges the

6     court's conclusion that he malingered during the IQ tests administered by Drs. Kury and

7     Ruff.   But having reviewed the record, the court's factual findings are not unreasonable

8     under § 2254(d)(2).

9

10         In 2004, Dr. Kury administered eight separate IQ tests, averaged them, and arrived

11    at a full-scale IQ score of 65.  (RT 5/3/07 at 37, 79-80, 83-89; *see* Doc. 285, Ex. 1 at 25-

12    26.)  Dr. Kury testified that the applicable margin of error is ± 15 points, and agreed that

13    there "is a 95 percent certainty that Michael Apelt's IQ of 65 average, really falls

14    somewhere between 50 or 80."  (*Id.* at 111–12.)  In 2000, Dr. Ruff administered a battery

15    of IQ tests and determined that Apelt's full-scale IQ was 61, with a margin of error of ± 5

16    points.  (RT 5/10/07 at 88–111, 194.)

17

18         Dr. Kury testified that he detected "slight malingering" by Apelt but it did not

19    "significantly" affect the IQ scoring. (RT 5/3/07 at 86.)   He further stated there were

20    "indications" of malingering but they were not "strong enough" for him to "change his

21    opinions."  (*Id.* at 95.)   According to Dr. Kury, even if malingering had affected the

22    testing, so that Apelt's IQ was higher than the reported 65, "it would still be a problem

23    case." (*Id.*)  Dr. Kury also testified Apelt's reported childhood IQ score of 88 was too

24

25

26

27

28

high "in principle" for him to have been placed in special education, and "usually" a child with that score would not be sent to such a school. (*Id.* at 88.)

Dr. Ruff testified that Apelt's "IQ was probably impaired by the time he reached 18." (5/10/07 at 105.) He explained, "I am not exactly sure what IQ he had at age 18," but assuming Apelt's IQ was 88 at age nine, Dr. Ruff did not believe it remained at that level. (*Id.* at 102.) Instead, it likely "tapered downward" because Apelt was placed in a special education school where he lacked the proper instruction and stimulation to develop his intellectual capacity. (*Id.* at 103–04.)

Dr. Ruff acknowledged it was possible Apelt malingered on some tests. (*Id.* at 207.) He administered a test to detect malingering, which Apelt passed. (*Id.* at 234.) The fact that Apelt passed the test, however, "[d]oes not mean that I don't think there were moments when he didn't exaggerate, given [sic] poor efforts." (*Id.*) Dr. Ruff further clarified that, "I cannot from one test conclude that all of the other data attention [sic] is reliable. I want to say that test, he passed. That is all." (*Id.*)

In his report, Dr. Moran wrote that Apelt "was assessed to have an IQ of 88 and thus would not be considered mentally retarded before age 18." (Doc. 285, Ex. 5 at 59.) He testified, however, that both Apelt's childhood HAWIE-R score of 88 and his 2004 adult score of 47, on a test administered by Dr. Kury, were probably in error. (RT 5/8/07 at 48–49.)

Dr. Moran further testified that during their interviews it appeared Apelt was "dissimulating" or malingering to show that his intellectual function was lower than it

1

2

3

4

actually was.  (RT 5/10/07.)  Rather than trying to mask his deficiencies, as people with intellectual disability often do, Apelt was trying to "demonstrate . . . his incompetence or deficiencies."  (RT 5/10/07 at 36.)

5

6

7

8

9

10

11

12

13

From this evidence, it was not unreasonable for the court to conclude Apelt had not established by clear and convincing evidence that he had subaverage intelligence at age 18.  The experts expressed skepticism about Apelt's childhood IQ score of 88, but the only specific challenge they offered was that Apelt would not have been placed in a special education school if his IQ had been that high.  That argument is unpersuasive as a criticism of the test because no one contests that Apelt's IQ was measured at 88 and, notwithstanding that result, he was in fact placed in a special education school.

14

15

16

17

18

19

20

Apelt argues the court unreasonably found the experts failed to account for the decline in Apelt's IQ from 88 to its present level.  As noted, Dr. Ruff testified that Apelt's IQ may have declined due to his placement in a special education school.  The fact that the court was not persuaded by this explanation does not render its findings about Apelt's IQ scores unreasonable.

21

22

23

24

25

26

27

28

Apelt also contends the court "misstated Dr. Tamm's opinion."  (Doc. 285 at 47.) Dr. Tamm, reviewing Apelt's EEG and MRI, found abnormalities "consistent with the hypothesis that [Apelt] suffered some remote brain damage, probably early in life."  (*Id.*, Ex. 7.)  As the court noted, Dr. Tamm characterized these abnormalities as "mild" and "nonspecific," possibly representative of a "normal variant."  (*Id.*)  The court found Apelt did not suffer any brain injury that would explain the decrease in his IQ.  (*Id.*, Ex. 27 at

- 50 -

1
2
3

4.)  Contrary to Apelt's argument, the court did not find that the absence of brain damage precluded a finding of intellectual disability.

4
5
6
7
8
9
10
11

As to Apelt's other criticisms of the state court's analysis, the fact that the court accepted the 15 point margin of error testified to by Dr. Kury does not affect the reasonableness of the court's findings.  Apelt asserts that with the application of the proper, five point margin of error to the IQ score of 65 obtained by Dr. Kury, there is a 95% chance that Apelt's IQ is between 60 and 70, rather than between 50 and 80, as the court stated in its ruling.

12
13
14
15
16
17

Dr. Kury repeatedly testified that the applicable margin of error was 15 percent. (RT 5/3/07 at 105–06; RT 5/4/07 at 38–39.)  Even assuming, as Apelt suggests, that this testimony was the result of a faulty translation, Apelt does not explain how the application of a wider margin of error affected the court's analysis of Apelt's IQ at the age of 18.[21]

18
19
20
21
22
23
24
25
26

Finally, the court did not clearly err when it noted the experts found evidence of malingering.  As discussed above, all of the experts testified that they detected some degree of malingering or dissimulation on Apelt's part.  Even Apelt's experts, Drs. Kury and Ruff, could not exclude the possibility that Apelt malingered during the IQ tests.  Dr. Kury testified the indications were not strong enough for him to change his overall opinion about Apelt's intellectual disability.  (RT 5/3/07 at 86.)  Dr. Ruff testified that

27
28

---

[21] Dr. Kury, a German national, testified through a translator.

Apelt passed a malingering test but he could not conclude that all the testing data were reliable.  (RT 5/10/07 at 234.)

Based on this testimony, the court did not clearly err by taking into account evidence of malingering when it considered whether Apelt met his burden of establishing subaverage intelligence.

### ii.   Adaptive behavior

Drs. Ruff and Moran assessed Apelt's adaptive behavior, reaching opposite conclusions.[22]  The state court determined Apelt failed to prove he suffered from significant deficits in adaptive behavior.  Applying the standard set forth in *Grell*—that Arizona law "does not require a finding of mental retardation based solely on proof of specific deficits or deficits in only two areas," 135 P.3d at 709—the court found that Apelt did not suffer from significant deficits in adaptive behavior.  Apelt contends the court erred by improperly discounting Dr. Ruff's conclusions. He argues Dr. Ruff's methodology and opinions were more credible than those of the state's expert, Dr. Moran.

Dr. Ruff administered the Independent Living Scales and Adaptive Behavior Assessment System, and reviewed collateral records from Apelt's family, friends, and teachers.  (*See* Doc. 285 at 52.)  Dr. Ruff concluded Apelt suffered from significant deficits in four of the 11 areas specified by the DSM-IV: social/interpersonal skills, financial responsibility, functional academics, and work. (*See* RT 5/10/07 at 113–29.)

---

[22] Dr. Kury did not conduct an adaptive functioning analysis.  He opined, however, that Apelt was intellectually disabled.  (RT 5/3/07 at 80–81.)

Dr. Moran disagreed and explained Apelt's conduct was actually indicative of anti-social personality disorder. (RT 5/8/07 at 41–44.)

The court was entitled to assess the relative credibility of the two experts and their opinions about these areas of Apelt's conduct. *See O'Neal v. Bagley*, 743 F.3d 1010, 1023 (6th Cir. 2013) ("With expert testimony split, as it often is, the state court chose to credit [the two experts] over [Apelt's expert], and we cannot say from this vantage that it was unreasonable to do so."). And the court's decision to credit one qualified expert over another is not enough to merit relief. Therefore, the Court did not clearly err when it found Apelt failed to prove he met the adaptive behavior prong of intellectual disability.[23]

### iii. Conclusion

When assessing the reasonableness of the state court's factual findings, this Court "must be particularly deferential to [its] state-court colleagues." *Taylor v. Maddox,* 266 F.3d 992, 1000 (9th Cir. 2004). To grant relief, it "must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *Id.*

---

[23] The state court found also that Apelt had "failed to prove by even a preponderance of the evidence that the onset of his subaverage intellectual functioning and adaptive behavior deficits occurred before he reached the age of eighteen." (Doc. 285, Ex. 27 at 7.) Accordingly, the court concluded Apelt had "failed to show by even a preponderance of the evidence that he is mentally retarded." (*Id.*) Having determined the state court did not err with respect to the subaverage intelligence and adaptive behavior prongs, the Court need not address the third prong.

In addressing Apelt's intellectual disability claim, the state court took into account the credibility of the witnesses, including each party's experts and their opposing opinions. The court's factual findings and credibility determinations are presumed to be correct. 28 U.S.C. § 2254(e)(1); *see also Thompson v. Keohane*, 516 U.S. 99, 111 (1995). And Apelt has not rebutted the court's factual findings with clear and convincing evidence. *Id.* The court's ruling on the *Atkins* issue was not based on an unreasonable determination of the facts under § 2254(d)(2); *see also Richter*, 562 U.S. at 101.

## G. Claim 27

Apelt's Claim 27 contends the clear and convincing standard by which the state court required him to prove his intellectual disability violated *Cooper v. Oklahoma*, 517 U.S. 348 (1996), and his rights to due process and freedom from cruel and unusual punishment.

*Cooper* prohibits a state from forcing a defendant to prove his competency to stand trial by clear and convincing evidence. 517 U.S. at 358-69. The Court in *Atkins*, however, expressly permitted states to establish their own procedures for determining intellectual disability. 536 U.S. at 317-18; s*ee Bobby v. Bies*, 556 U.S. 825, 831 (2009) (reiterating that *Atkins* "did not provide definitive procedural or substantive guides"). Therefore, there is no clearly established federal law setting a burden of proof in *Atkins* cases or extending *Cooper* to claims of intellectual disability. *See Hill v. Humphrey*, 662 F.3d 1335, 1349 (11th Cir. 2011) (noting "the absence of any Supreme Court burden of proof holding in mental retardation execution cases"). Therefore, the decision of the state

court to impose a clear and convincing standard is neither contrary to nor an unreasonable application of clearly established federal law.   28 U.S.C. § 2254(d)(1).   Apelt is not entitled to relief on Claim 27.

## CONCLUSION

For the reasons set forth above, Apelt is not entitled to relief on Claims 1-B, 1-D, 11, 14, 15, 17, 26 and 27.  The decisions of the state court rejecting these claims were not contrary to or an unreasonable application of clearly established federal law, or based on an unreasonable determination of the facts.[24]  28 U.S.C. § 2254(d).

With respect to Claim 12, Apelt has established the state court rejection of this claim was unreasonable.  The parties will be directed to submit supplemental briefs on whether an evidentiary hearing is needed.

## CERTIFICATE OF APPEALABILITY

Although this is not a final order in these proceedings, the Court has endeavored to determine, if judgment is ultimately entered against Apelt, whether a certificate of appealability (COA) should be granted on the issues addressed herein.

Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when a petitioner "has made a substantial showing of the denial of a constitutional right."  This showing can be established by demonstrating that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that

---

[24] Because Claim 1-D was never presented in state court, it appears the standard of review is different.  However, Claim 1-D fails on the merits regardless of the standard. *See* note 9.

- 55 -

the issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The Court finds that reasonable jurists could debate its resolution of Claims 11 and 26. For the reasons stated in this order, the Court finds that reasonable jurists could not debate its resolution of the remaining claims.

Accordingly,

**IT IS HEREBY ORDERED** denying Claims 1-B, 1-D, 11, 14, 15, 17, 26, and 27.

**IT IS FURTHER ORDERED** no later than September 18, 2015, each side shall submit a brief of no more than fifteen pages addressing whether an evidentiary hearing on Claim 12 is needed and, if so, the proposed scope of the evidentiary hearing. No later than September 28, 2015, each side shall submit responsive briefs of no more than ten pages. No replies are permitted absent further order.

Dated this 1st day of September, 2015.

Honorable Roslyn O. Silver
Senior United States District Judge